In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 12-2915, 12-3046 & 12-3158

WISCONSIN RIGHT TO LIFE, INC., and
WISCONSIN RIGHT TO LIFE STATE
POLITICAL ACTION COMMITTEE,

*Plaintiffs-Appellants*,

*v.*

THOMAS BARLAND,[*] in his official
capacity as Chair and Member of the
Wisconsin Government Accountability
Board, *et al.*,

*Defendants-Appellees*.

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 10-C-0669 — **Charles N. Clevert, Jr.**, *Judge*.

ARGUED JANUARY 18, 2013 — DECIDED MAY 14, 2014

---

[*] Thomas Barland has resumed the chairmanship of the Government Accountability Board. Pursuant to Fed. R. App. P. 43(c)(2), we have substituted him for Timothy Vocke.

Before POSNER, FLAUM, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. This is a sweeping challenge to Wisconsin's campaign-finance law in light of *Citizens United v. FEC*, 558 U.S. 310 (2010). Wisconsin Right to Life, Inc., and its State Political Action Committee—its "PAC" for state elections—sued to block the enforcement of many state statutes and rules against groups that spend money for political speech independently of candidates and parties. The complaint alleges that the challenged laws are vague and overbroad and unjustifiably burden the free-speech rights of independent political speakers in violation of the First Amendment.

This is our second encounter with the case. When it was last here, we addressed a single claim by the Wisconsin Right to Life State PAC: a challenge to section 11.26(4) of the Wisconsin Statutes, which caps at $10,000 the aggregate annual amount a donor may give to state and local candidates, political parties, and political committees. *See Wis. Right to Life State Political Action Comm. v. Barland* ("*Barland I*"), 664 F.3d 139, 143 (7th Cir. 2011). Applying *Citizens United*, we held that the aggregate contribution limit is unconstitutional as applied to organizations that independently spend money on election-related speech and permanently enjoined its enforcement against independent-expenditure groups and their donors. *Id.* at 155. Our ruling anticipated the Supreme Court's recent decision in *McCutcheon v. FEC*, 134 S. Ct. 1434 (2014), which more broadly invalidated the aggregate contribution limit in federal law.

The case returns on the remaining claims, which target a dizzying array of statutes and rules, from Wisconsin's ban on political spending by corporations to the interlocking definitions that determine state "political committee" status to the "noncoordination" oath and disclaimer requirements for independent political messages, to name just a few. The case comes to us from a decision granting in part and denying in part the plaintiffs' motion for a preliminary injunction. The district court enjoined the ban on corporate political spending, partially enjoined a regulatory disclaimer rule, and denied the rest of the motion. The plaintiffs appealed.

We vacate the court's order and remand with instructions to enter a new injunction. First, the present injunction order is improper in form and must be reentered to conform to the specificity requirements of Rule 65(d) of the Federal Rules of Civil Procedure. On the merits, in the domain of campaign-finance law, the First Amendment requires a heightened degree of regulatory clarity and a close fit between the government's means and its end, and some forms of regulation are categorically impermissible.

Like other campaign-finance systems, Wisconsin's is labyrinthian and difficult to decipher without a background in this area of the law; in certain critical respects, it violates the constitutional limits on the government's power to regulate independent political speech. Part of the problem is that the state's basic campaign-finance law—Chapter 11 of the Wisconsin Statutes—has not been updated to keep pace with the evolution in Supreme Court doctrine marking the boundaries on the government's authority to regulate election-related

speech. In addition, key administrative rules do not cohere
well with the statutes, introducing a patchwork of new and
different terms, definitions, and burdens on independent
political speakers, the intent and cumulative effect of which is
to enlarge the reach of the statutory scheme. Finally, the state
elections agency has given conflicting signals about its intent
to enforce some aspects of the regulatory mélange.

Whether the agency has the statutory authority to regulate
in this way is a serious question of state administrative law on
which no state court has weighed in. As we explained in
*Barland I*, the district judge initially abstained in this case to
await a ruling from the Wisconsin Supreme Court on the scope
of the agency's authority and a possible limiting construction
on one of the rules challenged here. 664 F.3d at 143–45. But the
state high court split evenly, with one justice recused, and the
original action was dismissed without decision. *See Wis.
Prosperity Network v. Myse*, 810 N.W.2d 356 (Wis. 2012) (per
curiam). So we must take the regulatory scheme as we find it,
testing it against federal constitutional standards.

Certain statutory provisions—the ban on corporate political
spending and the cap on the amount a corporation may spend
to raise money for an affiliated PAC—are obviously unconsti-
tutional under *Citizens United* and our decision in *Barland I*.
Other statutes and rules fail First Amendment standards as
applied to independent political speakers. Some of the chal-
lenged provisions withstand constitutional scrutiny. We will
identify the constitutional infirmities as we move through our
analysis, and on remand a new, permanent injunction should
be entered in accordance with this opinion. One statute—the

24-hour-reporting requirement for late contributions and expenditures—was recently amended to enlarge the reporting time to 48 hours. If the plaintiffs want to challenge the amended statute, they will have to do so in the first instance in the district court.

## I. Background

### A. The Parties

Wisconsin Right to Life is a nonprofit corporation with tax-exempt status as a social-welfare organization under 26 U.S.C. § 501(c)(4). Its mission is to advance pro-life positions— opposition to abortion, euthanasia, and the destruction of human embryos—in the spheres of ethics, law, and civil society, and to promote alternatives to these procedures. *See The Mission and Vision of Wisconsin Right to Life*, WIS. RIGHT TO LIFE, http://wrtl.org/mission (last visited May 9, 2014). In furtherance of this purpose, Wisconsin Right to Life engages in a range of political speech and public outreach on issues connected to its mission, including (among other things) mailings, fliers, information posted on its website, and various forms of advertising. It also occasionally seeks to participate in political advocacy in state elections, but Wisconsin law flatly prohibits it from doing so. *See* WIS. STAT. § 11.38(1)(a)1 (banning corporations from making contributions and disbursements for political purposes).

To avoid violating the statutory ban on election-related speech by corporations, Wisconsin Right to Life formed an affiliated PAC that engages in express advocacy in elections for

state offices. Wisconsin law prohibits the corporation from contributing to its PAC. *See id.* § 11.38(1)(a)2.

Neither the organization nor its state PAC contributes to candidates or other political committees, nor are they connected with candidates, their campaign committees, or political parties. That is to say, they operate independently of candidates and their campaign committees. We refer to the plaintiffs collectively as "Wisconsin Right to Life" unless the context requires us to distinguish between the organization and its PAC.

The Government Accountability Board was created in 2007 to replace the State Elections Board as the agency responsible for administering Wisconsin's campaign-finance and election laws. *See* 2007 Wis. Act 1 § 1. Its members are former state judges appointed by the governor from a nonpartisan slate nominated by a committee of sitting appellate judges. WIS. STAT. § 15.60. The Government Accountability Board is not itself the named defendant: The individual board members are sued in their official capacities, which amounts to the same thing. We refer to them collectively as "the GAB" or "the Board."

The GAB has joint enforcement authority with elected district attorneys to investigate violations of the state election laws and to prosecute civil violations; district attorneys in each county have exclusive authority to prosecute criminal violations. *Id.* § 5.05(2m). John Chisholm, the Milwaukee County District Attorney, is also named as a defendant because Wisconsin Right to Life has its headquarters in Milwaukee County. Because this is a preenforcement suit, however, our

focus is on the challenged statutes, rules, and other regulatory activity of the GAB, not on any specific action taken by the district attorney. So we need not mention Chisholm further, though he is, of course, bound by the injunction.

\*　　\*　　\*

Wisconsin Right to Life brought this suit as a comprehensive challenge to Wisconsin's campaign-finance law in the wake of *Citizens United*. The case is sprawling and the briefing unwieldy, but we have managed to isolate the core constitutional claims. To understand them requires a grasp of the intricacies of Wisconsin's campaign-finance system and some familiarity with its statutory, regulatory, and litigation history. The chronicle roughly corresponds to important developments in the Supreme Court's campaign-finance caselaw, so we'll include a discussion of the relevant cases along the way and come back to them later in the analysis.

Bear with us. The sweep of this case is very broad. To decide it requires a legal and political history of minor epic proportions and a good deal of regulatory detail. We will radically simplify, but significant length cannot be avoided.

### B. Wisconsin's Campaign-Finance System

The statutory requirements of Wisconsin's campaign-finance system are found in Chapter 11 of the Wisconsin Statutes, adopted in 1973 following the enactment of the Federal Election Campaign Act of 1971 ("FECA"), 2 U.S.C. §§ 431 *et seq.* Like its federal counterpart, Chapter 11 establishes an elaborate regulatory regime for campaign finance in

state elections, imposing organizational, registration, recordkeeping, reporting, attribution, and disclaimer duties on political speakers; the law also sets limits on contributions and expenditures for election-related activities and communications. The statutory scheme broadly applies to candidates, their campaign committees, political parties, independent groups, and individuals alike.

"To a lay reader, both statutes [FECA and Chapter 11] require almost any group that wants to say almost anything about a candidate or election to register as a political committee." *Wis. Right to Life, Inc. v. Paradise*, 138 F.3d 1183, 1184 (7th Cir. 1998); *see also* WIS. STAT. § 11.12(1) (flatly prohibiting contributions and spending for election-related speech except to, through, or by an individual or committee that has registered with and is regulated by the state elections agency). But the Supreme Court's decision in *Buckley v. Valeo*, 424 U.S. 1 (1976), limits what campaign-finance regulators may do. In *Buckley*, "[the] Court construed (some would say rewrote) the federal statute to avoid some of the many constitutional problems that arise when regulating political speech, the core of the [F]irst [A]mendment's domain." *Paradise*, 138 F.3d at 1184. "[M]any elements of the *Buckley* approach are required by the [F]irst [A]mendment, which means that they apply to the states." *Id.*

### 1. *Buckley v. Valeo*

We take our first detour into the caselaw to highlight the doctrine established in *Buckley*, which addressed a

comprehensive challenge to the 1971 federal law and remains the Supreme Court's baseline campaign-finance decision. We start with the broad foundational principles. Because free-flowing political debate is "integral to" our system of government, "'there is practically universal agreement that a major purpose of th[e] [First] Amendment was to protect the free discussion of governmental affairs, … of course includ[ing] discussions of candidates.'" *Buckley*, 424 U.S. at 14 (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)).[1] This agreement "reflects our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Id.* (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). The right to speak freely about political issues, public policy, and candidates for public office has both individual and associational aspects and "'has its fullest and most urgent application precisely to the conduct of campaigns for political office.'" *Id.* at 15 (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)).

To implement this vital constitutional protection, *Buckley* narrowed the reach of FECA and announced some limiting principles applicable to all campaign-finance laws. First, the government's authority to regulate in this area extends only to money raised and spent for speech that is clearly *election related*; ordinary political speech about issues, policy, and public officials must remain unencumbered. *See id.* at 42–44; *see also id.* at 78–80.

---

[1] The First Amendment provides that "Congress shall make no law … abridging the freedom of speech." U.S. CONST. amend. I.

Second, because political speech is at the core of the First Amendment right, overbreadth and vagueness concerns loom large in this area, especially when the regulatory scheme reaches beyond candidates, their campaign committees, and political parties. To protect against an unconstitutional chill on issue advocacy by independent speakers, *Buckley* held that campaign-finance regulation must be precise, clear, and may only extend to speech that is "unambiguously related to the campaign of a particular federal candidate." *Id.* at 80. To put the point differently, "'[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in [this] area only with narrow specificity.'" *Id.* at 41 n.48 (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).

The 1971 law was both too uncertain and too broad to satisfy the constitutional requirements of clarity and precision; *Buckley* held that the "constitutional deficiencies [of vagueness and overbreadth] … can be avoided *only* by reading [the federal statute] as limited to communications that include explicit words of advocacy of election or defeat of a candidate." *Id.* at 43 (emphasis added). In other words, the First Amendment forbids the government from regulating political expression that does not "in express terms advocate the election or defeat of a clearly identified candidate." *Id.* at 44.

Applying this limiting principle to FECA's disclosure requirements for independent political expenditures, the Court gave the federal statute a narrowing construction, holding that the disclosure duties could be triggered only when "funds [are] used for communications that expressly advocate the election or defeat of a clearly identified candidate." *Id.* at 80. In a

famous footnote, the Court listed some examples of express advocacy: "vote for," "elect," "support," "cast your ballot for," "Smith for Congress," "vote against," "defeat," and "reject." *Id.* at 44 n.52. These are the *Buckley* "magic words."

The Court also narrowed the scope of "political committee" status to reach only groups that engage in election advocacy as their major purpose. *Id.* at 79–80. This, too, was an application of the constitutional-avoidance doctrine to address vagueness and overbreadth concerns. Political-committee status carries a complex, comprehensive, and intrusive set of restrictions and regulatory burdens. *See* 2 U.S.C. §§ 433, 434(a)–(b), 441a(a)(1)(C), 441b(a). *Buckley* held that "[t]o fulfill the purposes of the Act[,] [the definition of political committee] need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate." 424 U.S. at 79. Expenditures by political committees "so construed" clearly "fall within the core area sought to be addressed by Congress. They are, by definition, campaign related." *Id.*

Finally, the Court drew a distinction between restrictions on *expenditures* for election-related speech and restrictions on *contributions* to candidates. *Buckley* held that limits on contributions are reviewed under an intermediate standard of scrutiny and may be permissible based on the public interest in preventing quid pro quo corruption, but limits on expenditures get strict scrutiny and usually flunk. *See id.* at 25–27, 55–56; *see also Barland I*, 664 F.3d at 152–53. The distinction drawn in *Buckley* between expenditures and contributions may be eroding—and with it the different standards of review—but for now these

categories remain. *See McCutcheon*, 134 S. Ct. at 1445 (opinion of Roberts, C.J.) ("[W]e see no need in this case to revisit *Buckley*'s distinction between contributions and expenditures and the corollary distinction in the applicable standards of review."); *see also id.* at 1462–65 (Thomas, J., concurring in judgment) (calling for strict scrutiny of contribution limits).

\*   \*   \*

As originally enacted, Chapter 11 of the Wisconsin Statutes contained many of the same constitutional infirmities as the federal statute. Soon after the *Buckley* decision was released, the Attorney General of Wisconsin issued an opinion to the State Elections Board—the predecessor to the GAB—advising it that some parts of Chapter 11 were unconstitutional and others must be narrowly construed. *See* 65 Op. Att'y Gen. Wis. 145 (1976); *see also Paradise*, 138 F.3d at 1185. Chapter 11 was thereafter amended to incorporate *Buckley*'s express-advocacy limiting principle. *See Elections Bd. v. Wis. Mfrs. & Commerce*, 597 N.W.2d 721, 727–28 (Wis. 1999).

### 2. *Chapter 11*

The various prescriptions and proscriptions in Chapter 11 apply to candidates, individuals, and political committees, broadly defined. A "committee" or "political committee" (the terms are used interchangeably) is "any person other than an individual and any combination of 2 or more persons, permanent or temporary, which *makes or accepts contributions or makes disbursements*, whether or not engaged in activities which are

exclusively political." WIS. STAT. § 11.01(4) (emphasis added).[2] Like its federal counterpart, Chapter 11 is structured so that political-committee status is determined indirectly, by the making or acceptance of "contributions" or the making of "disbursements" (called "expenditures" in the federal law). *See id.*; *see also* 2 U.S.C. § 431(4) (defining "political committee"). In state law, as in FECA, this status triggers complicated and burdensome regulatory restrictions and requirements, so defining "committee" in this way brings *Buckley*'s vagueness and overbreadth concerns into play.

Committees under Chapter 11 can be general or specific, and connected to or independent of candidates, parties, or partisan legislative caucuses. Specific varieties mentioned in the statute include personal campaign committees, legislative campaign committees, support committees, political party committees, and "special interest" committees. *See* WIS. STAT. § 11.05(3). A personal campaign committee is just what it sounds like: a political committee operated by a candidate or with the candidate's authorization. *See id.* § 11.01(15). Legislative campaign committees are party committees "organized in either house of the legislature to support candidates of a political party for legislative office." *Id.* § 11.01(12s). Other committee types are left undefined.[3]

---

[2] The general statutory definition of "person" includes "all partnerships, associations and bodies politic or corporate." WIS. STAT. § 990.01(26).

[3] As in federal campaign-finance jargon, state political committees are sometimes colloquially referred to as "PACs."

Chapter 11 provides that "every committee other than a personal campaign committee which makes or accepts contributions, incurs obligations, or makes disbursements in a calendar year in an aggregate amount in excess of $25" must register with the state elections agency. *Id.* § 11.05(1) (establishing the general registration requirement). Candidates and their personal campaign committees have an absolute duty to register; there is no expenditure or disbursement threshold. *See id.* § 11.05(2g). Individuals also must register if they "accept[] contributions, incur[] obligations, or make[] disbursements in a calendar year in an aggregate amount in excess of $25 to support or oppose the election or nomination of a candidate." *Id.* § 11.05(2).

The dollar threshold for registration was recently raised and is now $300—still a very modest amount. *See* 2013 Wis. Act 153 §§ 5, 6, 9 (effective Mar. 29, 2014). The remaining criteria for registration are unaffected by the recent legislation.

Registration carries certain organizational prerequisites. Committees must appoint a treasurer. (Individual registrants are considered their own treasurers.) WIS. STAT. § 11.10(3). The treasurer is personally liable for violations of the reporting duties and other requirements of the regulatory system. *Id.* § 11.20(13). Committees (individual registrants too) must maintain a separate depository account, *id.* § 11.14(1), keep detailed records of all contributions and disbursements exceeding $10, *id.* § 11.12(3), and maintain those records for a minimum of three years, *id*. No financial activity may occur without a registered treasurer in place, and all financial activity

requires authorization of the treasurer or his designated agent. *Id.* § 11.10(3).

Registration entails filing a document with the state elections agency containing the committee's name and address; the name and address of the treasurer and any other principal officers; the account number and location of the depository account; and a statement identifying the purpose of the committee. *See id.* § 11.05(3). Changes to this information must be reported within ten days. *Id.* § 11.05(5). Other than candidates and personal campaign committees, every registrant must pay an annual fee of $100, but the fee can be waived if in a calendar year the committee does not make disbursements exceeding $2,500. *Id.* § 11.055(1), (3).

All registrants—candidates, their committees, party committees, independent committees, and individuals—must file frequent, detailed reports disclosing all financial activity. *See id.* § 11.06. The extent of the reporting burden is important here; we will come back to this point in a moment.

A committee making "independent disbursements" must file an oath with the registration statement affirming that disbursements are not coordinated with any candidate or candidate's agent. *Id.* § 11.06(7)(a).[4] The oath must be refiled

---

[4] The full oath provision is as follows:

> OATH FOR INDEPENDENT DISBURSEMENTS. (a) Every committee, other than a personal campaign committee, which and every individual, other than a candidate who desires to make disbursements during any calendar year, which are
>
> (continued...)

every calendar year and amended "whenever there is a change in the candidate or candidates to whom it applies." *Id.* § 11.06(7)(b).

Registrants have a continuing duty to open their books to public inspection: All financial activity must be disclosed to the

---

[4] (...continued)

> to be used to advocate the election or defeat of any clearly identified candidate or candidates in any election shall before making any disbursement [in excess of $25] … , file with the registration statement under s. 11.05 a statement under oath affirming that the committee or individual does not act in cooperation or consultation with any candidate or agent or authorized committee of a candidate who is supported, that the committee or individual does not act in concert with, or at the request or suggestion of, any candidate or any agent or authorized committee of a candidate who is supported, that the committee or individual does not act in cooperation or consultation with any candidate or agent or authorized committee of a candidate who benefits from a disbursement made in opposition to a candidate, and that the committee or individual does not act in concert with, or at the request or suggestion of, any candidate or agent or authorized committee of a candidate who benefits from a disbursement made in opposition to a candidate. A committee which or individual who acts independently of one or more candidates or agents or authorized committees of candidates and also in cooperation or upon consultation with, in concert with, or at the request or suggestion of one or more candidates or agents or authorized committees of candidates shall indicate in the oath the names of the candidates or candidates to which it applies.

WIS. STAT. § 11.06(7)(a).

government in regular periodic filings. Chapter 11 requires registrants to file detailed reports with the state elections agency at specified intervals throughout the year describing all financial activity since the last report, including "all contributions received, contributions or disbursements made, and obligations incurred." *Id.* § 11.06(1). For contributions received in excess of $20, the report must include the date of the contribution, the name and address of the contributor, and "the cumulative total contributions made by that contributor for the calendar year." *Id.* § 11.06(1)(a). For contributions received in excess of $100, the registrant must obtain and report the name and address of the donor's place of employment. *Id.* § 11.06(1)(b). All other income in excess of $20—including transfers of funds, interest, returns on investments, rebates, and refunds received—must be listed and described. *Id.* § 11.06(1)(c)–(d).

Registrants must report all disbursements. For every disbursement in excess of $20, the registrant must include the name and address of the recipient, the date of the disbursement, and a statement of its purpose. *Id.* § 11.06(1)(g). Individuals and committees "not primarily organized for political purposes" need only report disbursements made for the purpose of "expressly advocat[ing] the election or defeat of a clearly identified candidate." *Id.* § 11.06(2). In other words, committees in this category need not report general operating expenses; for all other committees, "administrative and overhead expenses" must be reported as disbursements. *See id.* § 11.01(16). All disbursements that count as contributions to candidates or other committees must be reported. *See id.* § 11.06(2).

Finally, each financial report must itemize the following: (1) total contributions made, contributions received, and disbursements made during the reporting period and cumulatively year-to-date (including reporting-period and cumulative year-to-date totals for individual donors and recipients); (2) the balance of obligations incurred as of the end of the reporting period; and (3) the registrant's cash on hand at the beginning and end of the reporting period. *Id.* § 11.06(1)(i), (k), (L) & (m). Committees and individuals making independent disbursements (expenditures made independently of candidates and their campaign committees) also must include "a separate schedule showing for each disbursement which is made independently of a candidate … the name of the candidate or candidates on whose behalf or in opposition to whom the disbursement is made, indicating whether the purpose is support or opposition." *Id.* § 11.06(1)(j).

Financial reports are due in January and July of every year. Registrants also must file "preprimary" and "preelection" reports on specified dates before the spring primary and spring general election and before the fall primary and fall general election, bringing the total to as many as six reports a year depending on the election calendar. *Id.* § 11.20. When a committee disbands, it must file a termination report. *Id.* § 11.19(1). Registrants may file a suspension report if there will be no disbursements, contributions, or obligations in the aggregate of more than $1,000 in a calendar year, but the suspension is effective only for the calendar year in which it is approved by the elections agency. *Id.* § 11.19(2).

Other restrictions and requirements apply, but we'll pause here to catch our breath and summarize. Under Chapter 11 any group that makes or receives a "contribution," incurs an "obligation," or makes a "disbursement" in excess of $300 in a calendar year is treated as a political committee. (Individuals are covered too, but we're mostly concerned with Chapter 11's application to organizational associations.) Committee status triggers substantial and continuous organizational, registration, and recordkeeping requirements, and compliance is required *before* any money is spent for election-related speech; the periodic reporting duties kick in immediately thereafter.

So the whole regulatory system turns on what counts as a "contribution," "obligation," or "disbursement." Chapter 11 defines all three terms very broadly to include anything of value given or spent "for political purposes."[5] That all-important phrase is defined as follows:

---

[5] More specifically, "contribution" means "[a] gift, subscription, loan, advance, or deposit of money or anything of value [except a loan from a commercial lending institution] … *made for political purposes.*" WIS. STAT. § 11.01(6)(a) (emphasis added). An "incurred obligation" means "every express obligation … including every loan, guarantee of a loan or other obligation or payment for any goods, or for any services … incurred by a candidate, committee[, or] individual … *for political purposes.*" *Id.* § 11.01(11) (emphasis added). A "disbursement" means a "purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value [except a loan from a commercial lending institution] … , [or a 'contract, promise, or agreement' to do any of these things] *made for political purposes.*" *Id.* § 11.01(7)(a) (emphasis added).

> **(16)** An act is for "political purposes" when it is done *for the purpose of influencing* the election or nomination for election of any individual to state or local office, *for the purpose of influencing* the recall from or retention in office of an individual holding a state or local office, for the purpose of payment of expenses incurred as a result of a recount at an election, or *for the purpose of influencing* a particular vote at a referendum. …
>
> *(a) Acts which are for "political purposes" include but are not limited to:*
>
> *1. The making of a communication which expressly advocates the election, defeat, recall or retention of a clearly identified candidate* or a particular vote at a referendum.

*Id.* § 11.01(16) (emphases added).

The "express advocacy" language we have italicized above was added to comply with the requirements laid down in *Buckley*. *See Wis. Mfrs. & Commerce*, 597 N.W.2d at 727–28. The effect of this limiting language was to place issue advocacy—political ads and other communications that do *not* expressly advocate the election or defeat of a clearly identified candidate—beyond the reach of the regulatory scheme. *Id.* at 729–31; *see also* WIS. ADMIN. CODE ELBD § 1.28 (1977); 65 Op. Att'y Gen. at 152–54.

A few of Chapter 11's other requirements and restrictions are directly or indirectly implicated here. Anonymous disbursements are prohibited. Any advertisement or other

communication by a political committee must contain an attribution specifically including the words "Paid for by" followed by the name of the committee and its treasurer. WIS. STAT. § 11.30(2)(b). Advertisements and other communications by independent committees must carry an additional disclaimer: "Not authorized by any candidate or candidate's agent or committee." *Id.* § 11.30(2)(d). A related administrative rule requires that any "political message" by an individual or group acting independently of a candidate contain a much wordier disclaimer:

> The committee (individual) is the sole source of this communication and the committee (individual) did not act in cooperation or consultation with, and in concert with, or at the request or suggestion of any candidate or any agent or authorized committee of a candidate who is supported or opposed by this communication.

WIS. ADMIN. CODE GAB § 1.42(5).

Contribution limits apply. Earlier in this case we addressed one of them—section 11.26(4), the $10,000 aggregate annual cap on contributions to candidates and committees—and found it unconstitutional under *Citizens United* as applied to contributions to independent groups. *Barland I*, 664 F.3d at 155. Separately, subsections 11.26(1) and (2) impose specific dollar limits on contributions to candidates, their personal campaign committees, and any independent committee "acting solely in support of such a candidate or solely in opposition to the candidate's opponent."

Finally, like the federal statute at issue in *Citizens United*, Chapter 11 bans all political speech by corporations: No corporation may "make any contribution or disbursement, directly or indirectly, either independently or through any political party, committee, group, candidate or individual." WIS. STAT. § 11.38(1)(a)1. A corporation may, however, create a separate segregated fund for election-related speech, which has the status of a political committee and must register and report as such. *Id.* § 11.38(1)(a)2. The corporation may "solicit contributions from individuals to the fund … for the purpose of supporting or opposing any candidate for state or local office," but the corporation itself may not contribute to the fund. *Id.* Until recently, Chapter 11 also provided that no corporation may spend "more than a combined total of $500 annually for solicitation of contributions" to its segregated fund (i.e., to its affiliated PAC). *Id.* § 11.38(1)(a)3. The spending limit on fundraising by corporations for affiliated PACs was recently raised to $20,000 or 20% of the amount the committee raised the previous year. *See* 2013 Wis. Act 153 § 21m.

## C. Chapter 11 in the Courts

Although Chapter 11 has been on the books for more than 40 years, the Wisconsin Supreme Court has addressed it only twice. In *Gard v. State Elections Board*, 456 N.W.2d 809, 826–29 (Wis. 1990), the court upheld the limits on contributions to candidates, relying on the distinction drawn in *Buckley* between campaign contributions and expenditures. More relevant is *Elections Board v. Wisconsin Manufacturers & Commerce*, a major

test of the scope of the state's regulatory authority under *Buckley*.

### 1. *Elections Board v. Wisconsin Manufacturers & Commerce*

In the fall of 1996, an affiliate of Wisconsin Manufacturers & Commerce, Inc. ("WMC"), the state's largest business group, sponsored radio and television ads naming several state legislators who were on the November ballot. The ads were the kind that have become ubiquitous in each election cycle ever since *Buckley* drew the regulatory line at express advocacy. The narrator described the legislators' voting records on particular issues—specifically, on the issues of taxes and crime—and urged listeners to call the lawmakers and voice their disapproval. *Wis. Mfrs. & Commerce*, 597 N.W.2d at 724–25.

The targeted legislators waged a two-front legal battle to force the ads off the air. First, they filed administrative complaints with the State Elections Board; second, they sued WMC and its affiliate seeking court orders enjoining the ads. *Id.* at 725; *see also* WIS. STAT. § 11.66 (authorizing private suits by electors to compel compliance with Chapter 11). The litigation strategy was successful. Trial judges around the state ordered the WMC affiliate to remove the ads from the air. *Wis. Mfrs. & Commerce*, 597 N.W.2d at 725.

When the election was over, the Elections Board took up the administrative complaints, classified the ads as express advocacy under Chapter 11, and ordered the affiliate to register as a political committee and file retrospective and

prospective financial reports. *Id.* Predictably, the organization refused to comply, so the Board filed an enforcement action seeking per diem monetary penalties and injunctive relief. *Id.* at 725–26. The trial court dismissed the case, holding that the Board's approach to the express-advocacy classification was unconstitutionally ad hoc and vague, amounted to retroactive rulemaking, and was not adequately tailored to satisfy First Amendment scrutiny. *Id.* at 726.

The state supreme court affirmed, but on the narrowest ground. The court held that the Board had impermissibly engaged in retroactive rulemaking by "creating and attempting to apply [a] new, context-oriented interpretation of the statutory term express advocacy" while adjudicating an administrative complaint. *Id.* at 735. The court agreed with the trial judge that "it would be profoundly unfair to apply a previously unarticulated test, retroactively, to these defendants." *Id.*

Having decided the case on this procedural ground, the court specifically declined to "craft a new standard of express advocacy for the state of Wisconsin," leaving that task to the legislature or the Board. *Id.* at 736. But the court offered some guidance regarding the permissible scope of any standard the legislature or agency might write. First, "*Buckley* stands for the proposition that it is unconstitutional to place reporting or disclosure requirements on communications which do not 'expressly advocate the election or defeat of a clearly identified candidate.'" *Id.* at 731 (quoting *Buckley*, 424 U.S. at 80). Next, to qualify as "express advocacy" within the meaning of section 11.01(16), a communication "must contain explicit

language advocating the election or defeat of a candidate who is clearly identified." *Id.* Finally, the court allowed that any statutory or regulatory definition of express advocacy "may encompass more than the specific magic words in *Buckley* footnote 52," but reminded legislators and regulators that the definition must be "limited to communications that include explicit words of advocacy of election or defeat of a candidate." *Id.* at 737 (internal quotation marks omitted).

### 2. *Campaign Finance Reform Is Tried and Fails in Wisconsin*

*Wisconsin Manufacturers & Commerce* was decided in July 1999. The Elections Board thereafter amended its existing administrative rule regarding the scope of regulated campaign activity to conform to the state supreme court's guidance on the meaning of express advocacy. *See* ELBD § 1.28 (2001). At the same time, however, state campaign-finance reformers were hard at work trying to move a proposal through the state legislature expanding the regulatory scheme to cover issue ads like those targeted in *Wisconsin Manufacurers & Commerce*. In due course they succeeded, though as we'll see, their victory was short-lived.

In 2001 the legislature adopted major amendments to Chapter 11 broadening the definition of "political purposes" to cover issue ads and other communications naming a candidate in the lead-up to an election and otherwise expanding the scope of the state's regulation of political speech. 2001 Wis. Act 109; *see Wis. Realtors Ass'n v. Ponto* ("*Wis. Realtors I*"),

229 F. Supp. 2d 889, 890–91 (W.D. Wis. 2002). Under the new law, any communication made within 60 days of an election that "'includes a reference to … a clearly identified candidate'" qualified as a communication made for political purposes, thus triggering political-committee status and the full range of proscriptions and prescriptions in Chapter 11. *Wis. Realtors Ass'n v. Ponto* ("*Wis. Realtors II*"), 233 F. Supp. 2d 1078, 1083–84 (W.D. Wis. 2002) (quoting 2001 Wis. Act 109 § 1*ty*).

This expansion of the regulatory system was not designed to stick. The legislature included a nonseverability clause and a fairly obvious poison pill. Section 1*uck* (yes, you read that correctly) prohibited independent groups from sponsoring any communications that referred to a candidate within 30 days of an election without first filing a report with the Elections Board providing "'the name of each candidate who will be supported or whose opponent will be opposed and the total disbursements to be made.'" *Id.* at 1090 (quoting 2001 Wis. Act 109 § 1*uck*) (emphasis omitted). Failure to file the minimum 31-day notice meant a total speech blackout: no political communications allowed in the final month of the campaign. *Id.*

Before the ink was dry on the governor's signature, the new law was challenged in state and federal court. *See Wis. Realtors I*, 229 F. Supp. 2d at 891. The constitutional cloud over the legislature's handiwork was so conspicuous that lawmakers included a nonstatutory provision directing the Attorney General to "promptly commence" an original action in the state supreme court asking the justices to decide whether the law was unconstitutional. *Id.* As it turned out, the federal court reached judgment first, striking down the advance-notice

provision as an unconstitutional form of prior restraint on speech. *Wis. Realtors II*, 233 F. Supp. 2d at 1090–93. By operation of the nonseverability clause, the new law was invalid in its entirety. *Id*. at 1093; *see also Wis. Right to Life, Inc. v. Schober*, 366 F.3d 485, 487–88 (7th Cir. 2004) (describing this history).

*   *   *

Since the ill-fated 2001 law, legislative support for more regulation of political speech has evaporated. New efforts to enlarge the scope of Chapter 11 have consistently failed to get off the ground.[6] Instead, the momentum runs in the opposite direction. The most recent statutory amendments are modestly *de*regulatory: The legislature raised the monetary threshold for PAC status (at $300, it's still quite low), loosened restrictions on contributions by lobbyists, and created an exemption for certain uncompensated political activity on the Internet. *See* 2013 Wis. Act 153.

## D. Important Federal Developments

As Wisconsin's campaign-finance reform movement was collapsing, Congress enacted the Bipartisan Campaign Reform Act of 2002—"BCRA" for short, but better known as the "McCain-Feingold" law for its principal Senate sponsors. Pub. L. No. 107-155, 116 Stat. 81. (codified at 2 U.S.C. §§ 438a, 441a–

---

[6] A nonexhaustive list of failed campaign-finance reform bills includes 2005 Assembly Bill 392; 2005 Senate Bill 538; 2007 Senate Bill 1, Dec. Spec. Sess.; 2007 Senate Bill 12; 2007 Senate Bill 77; 2007 Senate Bill 182; 2007 Assembly Bill 272; 2007 Assembly Bill 355; 2007 Assembly Bill 704; 2009 Senate Bill 221; 2009 Assembly Bill 388; and 2009 Assembly Bill 812.

441i, 441k). McCain-Feingold brought a subset of issue advocacy into the federal regulatory sphere, introducing a new category of regulated political speech: "electioneering communication[s]," defined as "any broadcast, cable, or satellite communication" that "refers to a clearly identified candidate for Federal office" and appears within 60 days of a federal general election or 30 days of a federal primary election. 2 U.S.C. § 434(f)(3)(A).

Among other things, McCain-Feingold prohibited corporations and labor unions from making contributions or expenditures for electioneering communications; express advocacy by corporations and unions was already banned. *See id.* § 441b. The new law also established a limited disclosure requirement for expenditures for electioneering communications in excess of $10,000 in a calendar year. At that level of spending, the sponsoring group must file a statement with the Federal Election Commission disclosing its identity and place of business, some basic information about the expenditure (the amount and to whom it was paid), the election to which the expenditure pertains, and the identity of donors who contributed $1,000 or more for the electioneering communications. *Id.* § 434(f)(1)–(2). In most cases the disclosure statement is due within 24 hours of a qualifying expenditure above the statutory threshold. *Id.* § 434(f)(1), (4).

### 1. *McConnell v. FEC*

BCRA largely survived its first constitutional test in *McConnell v. FEC*, 540 U.S. 93 (2003). As relevant here, the Supreme Court rejected a facial challenge to the ban on

corporate sponsorship of electioneering communications, explaining that the express-advocacy line drawn in *Buckley* was "an endpoint of statutory interpretation, not a first principle of constitutional law." *Id.* at 190. Still, the Court acknowledged that the limitation was "born of an effort to avoid [the] constitutional infirmities" of vagueness and overbreadth, *id.* at 192, so the ultimate holding in *McConnell* was narrow: The federal ban on corporate electioneering communications was facially valid, but only "to the extent that … issue ads during the 30- and 60-day periods … are the *functional equivalent* of express advocacy," *id.* at 206 (emphasis added).

This left the door open for as-applied challenges. But the Court did not explain what it meant by "functional equivalence." Instead, it simply "assume[d] that the interests that justify the regulation of campaign speech might not apply to the regulation of genuine issue ads." *Id.* at 206 n.88. The concept of "functional equivalence" acquired some content a few years later when the ban on corporate electioneering communications returned to the Court, this time in the context of an as-applied challenge brought by our plaintiff here. *See FEC v. Wis. Right To Life, Inc. ("Wis. Right to Life II")*, 551 U.S. 449, 455–57 (2007).[7]

---

[7] In an earlier decision in the same litigation—commonly referred to as "*Wisconsin Right to Life I*"—the Court clarified that *McConnell* did not foreclose as-applied challenges to the federal ban on corporate electioneering communications. *See Wis. Right to Life, Inc. v. FEC*, 546 U.S. 410, 412 (2006) (per curiam).

### 2. *Wisconsin Right to Life II*

In the summer of 2004, Wisconsin Right to Life prepared television and radio ads criticizing the filibuster of federal judicial nominees and began to broadcast them in early August. *Id.* at 458–59. The ads named Wisconsin's senators and urged listeners to call and tell them to oppose the filibuster. *Id.* But BCRA's blackout period before the federal primary election commenced on August 15, so Wisconsin Right to Life sought declaratory and injunctive relief against the speech ban as applied to issue ads of this type. *Id.* at 460.

The Supreme Court held that Wisconsin Right to Life could not be prohibited from using its general treasury funds to sponsor these ads, but the decision was fractured. Of the five justices in the majority, three would have overruled *McConnell* to the extent that it had facially upheld the ban on corporate electioneering communications. *See id.* at 483–504 (Scalia, J., concurring in part and concurring in the judgment, joined by Kennedy and Thomas, J.J.). Chief Justice Roberts, joined by Justice Alito, took a narrower path, concluding that the ads were neither express advocacy nor its functional equivalent and thus could not be banned. *Id.* at 476–82 (opinion of Roberts, C.J.)

The Chief Justice explained that "[p]rior to BCRA, corporations were free under federal law to use independent expenditures to engage in political speech so long as that speech did not expressly advocate the election or defeat of a clearly identified federal candidate." *Id.* at 457. But BCRA "ma[de] it a federal crime for any corporation to broadcast, shortly before an election, any communication that names a federal candidate

for elected office and is targeted to the electorate." *Id.* at 455–56. The law had "survive[d] strict scrutiny [in *McConnell*] to the extent it regulates express advocacy or its functional equivalent," *id.* at 465, so if the antifilibuster ads were express advocacy or its equivalent, that holding controlled unless revisited and overruled, *id.* If, on the other hand, the ads were *not* express advocacy or its equivalent—i.e., if they were "genuine issue ads"—then *McConnell* did not apply. *Id.*

"Express advocacy" had an established meaning under *Buckley*, but the concept of "functional equivalence" was new. It was not clear how to determine on a case-by-case basis whether a particular communication counted as the functional equivalent of express electoral advocacy. The Chief Justice provided a test: "[A]n ad is the functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *Id.* at 469–70. His lead opinion also provided a framework for applying the test: (1) [T]he inquiry "must be objective, focusing on the substance of the communication rather than amorphous considerations of intent and effect," *id.* at 469; (2) "contextual factors … should seldom play a significant role in the inquiry," *id.* at 473–74; (3) because *the government* has the burden of justifying restrictions on political speech, the speaker gets the benefit of any doubt, *id.* at 464–65; and (4) if an ad "may reasonably be interpreted as something other than as an appeal to vote for or against a specific candidate, … [then it is] not the functional equivalent of express advocacy," *id.* at 476.

On this understanding of functional equivalence, the Chief Justice held that the antifilibuster ads

> are plainly not the functional equivalent of express advocacy. First, their content is consistent with that of a genuine issue ad: The ads focus on a legislative issue, take a position on the issue, exhort the public to adopt that position, and urge the public to contact public officials with respect to the matter. Second, their content lacks indicia of express advocacy: The ads do not mention an election, candidacy, political party, or challenger; and they do not take a position on a candidate's character, qualifications, or fitness for office.

*Id.* at 470. Because the ads were neither express advocacy nor its equivalent, *McConnell* did not apply and the government had to justify restricting the speech under strict scrutiny. It could not do so. The ban on corporate electioneering communications was unconstitutional as applied to Wisconsin Right to Life's speech. *Id.* at 481.

### E. The Government Accountability Board Enters the Scene

In January 2008—six months after the Supreme Court issued its decision in *Wisconsin Right to Life*—the Government Accountability Board opened its doors as the new regulatory agency responsible for administering Wisconsin election law, taking over for the dissolved Elections Board. At the time, the predecessor agency had been weighing new rulemaking to

broaden the scope of the campaign-finance system to cover a subset of issue ads akin to the "electioneering communications" now covered by federal law. This proved to be a heavy regulatory lift. Restricting political speech is inherently controversial, and many stakeholders reasonably questioned whether the agency had the statutory authority to add new categories of regulated speech not covered by Chapter 11.[8] The effort stalled in the Elections Board. The new agency picked up where its predecessor left off.

Recall that soon after the state supreme court decided *Wisconsin Manufacturers & Commerce*, the Elections Board amended its existing administrative rule governing the scope of regulated activity to conform to the limits identified in the court's opinion. The amended rule defined "political committee" as "every committee which is formed primarily to influence elections or which is under the control of a candidate," and also specified that

> **(2)** Individuals other than candidates and committees other than political committees are subject to the applicable disclosure-related and recordkeeping-related requirements of ch. 11, Stats., *only* when they:

[8] *See* GAB, Open Session Agenda Materials (Mar. 26, 2008), http://gab.wi.gov/sites/default/files/event/74/03_26_2008_agenda_materials_pdf_96273.pdf. The administrative history of the rules at issue here may be found on the GAB's website under "Board Meetings."

> (a) Make contributions for political purposes, or
>
> (b) Make contributions to any person at the request or with the authorization of a candidate or political committee, or
>
> (c) Make a communication containing terms such as the following *or their functional equivalents with reference to a clearly identified candidate that expressly advocates the election or defeat of that candidate and that unambiguously relates to the campaign of that candidate*:
>
> 1. "Vote for;"
> 2. "Elect;"
> 3. "Support;"
> 4. "Cast your ballot for;"
> 5. "Smith for Assembly;"
> 6. "Vote against;"
> 7. "Defeat;"
> 8. "Reject."

ELBD § 1.28(2) (2001) (emphases added).

In short, the agency clarified that the requirements of Chapter 11 applied only to (1) candidates and their committees; and (2) committees formed primarily to influence elections (understood in the *Buckley* sense). Other individuals and groups would be "subject to the applicable disclosure-related and recordkeeping-related requirements" of Chapter 11 only to the extent that they made contributions for political purposes or spent money for communications containing express

advocacy (again, understood in the *Buckley* sense) or its functional equivalent (understood in the *Wisconsin Right to Life II* sense), assuming the very low dollar threshold—then just $25—was crossed. The reference to the "applicable disclosure-related and recordkeeping-related requirements of Chapter 11" was not further explained.

The new agency initially reaffirmed ElBd § 1.28 but thereafter embarked on a project aimed at bringing a wide swath of issue advocacy within the regulatory scheme.[9] The Board directed its staff to draft a new version of § 1.28 significantly expanding its scope by adding a new category of regulated communications much broader than the federal "electioneering communications" at issue in *McConnell* and *Wisconsin Right to Life II*.[10] The new GAB § 1.28 is central to the claims in this case; we will reproduce it in a moment. For now, it's enough to say

---

[9] *See* GAB, Open Session Minutes (Aug. 27–28, 2008), http://gab.wi.gov/ sites/default/files/event/08_27_28_08_openmeetingminutes_pdf_20925.pdf; *Legality of GAB Proposal Expected To Be Challenged*, WIS. LAW J. (Nov. 24, 2008, 1:00 AM), http://wislawjournal.com/2008/11/24/legality-of-gab-proposal-expected-to-be-challenged/; Todd Richmond, *Board Asks if It Has Power on Issue Ads: Many Say It's Legislature's Purview*, ST. PAUL PIONEER PRESS, Aug. 29, 2008, *available at* 2008 WLNR 16398295; Mark Pitsch, *Board Urged To Regulate Issue Ads Critic Says Rules Would Infringe on Free Speech*, WIS. STATE J. (Aug. 27, 2008, 12:00 AM), http://host.madison.com/ news/ local/board-urged-to-regulate-issue-ads-critic-says-rules-would/article_ c05184ba-414c-5d14-bb39-840b3389ef80.html.

[10] *See* GAB, Open Session Minutes (Nov. 11, 2008), http://gab.wi.gov/sites/ default/files/event/11_11_08_openmeetingminutes_pdf_43114.pdf; GAB, Open Session Minutes (Jan. 15, 2009), http://gab.wi.gov/sites/default/files/ event/01_15_09_openmeetingminutes_pdf_15831.pdf.

that under the new version of the rule, almost anything a person might publicly say about a candidate within 30 days of a primary and 60 days of a general election triggers the entire panoply of proscriptions and prescriptions in Chapter 11 once the minimal spending threshold is crossed (then a mere $25; now $300).

The Board approved the new GAB § 1.28 in January 2009.[11] While it was in the final stages of the administrative process, however, the Supreme Court decided *Citizens United*, overruling *McConnell* in part and invalidating the federal ban on corporate and union independent spending for express advocacy and electioneering communications. *Citizens United*, 558 U.S. at 365–66.

### F. *Citizens United v. FEC*

*Citizens United* arrived at the Supreme Court in the same posture as *Wisconsin Right to Life II* — as an as-applied challenge to the federal ban on corporate-funded independent expenditures for express advocacy and electioneering communications. *Id.* at 321–22. Citizens United, a nonprofit corporation, produced a film called *Hillary: The Movie* and wanted to make it available by video-on-demand during the 2008 presidential primaries in which then-Senator Hillary Clinton was a candidate. *Id.* at 319–20. To promote the movie, the group produced

---

[11] *See* GAB, Open Session Minutes (Jan. 15, 2009), http://gab.wi.gov/sites/default/files/event/01_15_09_openmeetingminutes_pdf_15831.pdf. CR 09-13 was submitted to the Legislative Council Rules Clearinghouse on February 5, 2009. 638 Wis. Admin. Reg. 13 (Feb. 28, 2009).

several ads to air on broadcast and cable networks. *Id.* at 320. The federal ban on corporate political speech made it a crime to disseminate the ads and the movie if they qualified as express advocacy or its equivalent, so Citizens United sued for declaratory and injunctive relief, arguing that the corporate-speech ban and the disclosure and disclaimer requirements for electioneering communications were unconstitutional as applied to its speech. *Id.* at 321–22.

A three-judge district-court panel applied *McConnell* and rejected the challenge. *Citizens United v. FEC*, 530 F. Supp. 2d 274 (D.D.C. 2008). The Supreme Court heard the case, then surprised the political and legal worlds by ordering it rebriefed on the question of the continued viability of *McConnell*. *Citizens United*, 558 U.S. at 322. Following reargument, the Court issued its course-changing decision in January 2010.

The Court began by holding that *Hillary* and the ads promoting it were the functional equivalent of express advocacy under *Wisconsin Right to Life II* and thus fell within BCRA's ban on corporate electioneering communications. *Id.* at 324–25. This brought the full implications of *McConnell*'s facial holding starkly into focus: If a movie sponsored by a corporation could be banned during an election cycle, then so could a book or a pamphlet. *Id.* at 333. The Court observed that banning political expenditures by corporations is functionally a total "ban on corporate speech," even though "a PAC created by a corporation can still speak." *Id.* at 337. "PACs are burdensome alternatives … [,] expensive to administer and subject to extensive regulations," *id.*, and they must "comply with these regulations just to speak," *id.* at 338. Because these regulatory

burdens are "onerous," the PAC system is nearly "the equivalent of prior restraint." *Id.* at 335. And because the law was "an outright ban, backed by criminal sanctions," *id.* at 337, its chilling effect on core First Amendment speech rights was severe, making ad hoc, as-applied remedies seriously deficient, *id.* at 335–37. Accordingly, the Court reconsidered and partially overruled *McConnell*, facially invalidating the ban on corporate and union election-related spending. *Id.* at 365–66 (also overruling *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990), on which *McConnell* had relied).

Importantly here, *Citizens United* restored some earlier understandings about the constitutional limits on the government's authority to regulate election-related speech. First, the Court reinvigorated the principle that "political speech does not lose First Amendment protection 'simply because its source is a corporation,'" *id.* at 342 (quoting *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 784 (1978)), and held as a categorical matter that the government may not restrict political speech "based on a speaker's corporate identity," *id.* at 347. Second, the Court held that the only public interest strong enough to justify restricting election-related speech is the interest in preventing quid pro quo corruption or the appearance of corruption. *Id.* at 359–61. Third, the Court concluded that political spending by independent groups does not carry the risk of this kind of corruption because "[b]y definition, an independent expenditure is political speech presented to the electorate that is not coordinated with a candidate." *Id.* at 360. Accordingly, the Court held as a matter of law that "independent expenditures, including those made by corporations,

do not give rise to corruption or the appearance of corruption." *Id.* at 357.

Without an anticorruption rationale to support it, BCRA's ban on corporate electioneering communications was facially unconstitutional: "No sufficient governmental interest justifies limits on the political speech of nonprofit or for-profit corporations." *Id.* at 365.

The Court took a different approach to the disclaimer and disclosure requirements, although this part of the opinion is quite brief. Following the doctrine established in *Buckley*, the Court applied an intermediate standard of review—called "exacting scrutiny," but the label isn't important—and required a showing of "a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." *Citizens United*, 558 U.S. at 366–67 (quoting *Buckley*, 424 U.S. at 64, 66). The public's informational interest in knowing the sponsorship and funding sources of election-related ads had long been accepted as sufficiently important to justify disclosure and disclaimer rules. *Id*. at 367. So the only real question in *Citizens United* was the closeness of the fit between that interest and the specific requirements imposed on groups that sponsor electioneering communications. *Id*.

The federal disclaimer provision requires only that the ad identify in a "clearly spoken manner" the name of the group responsible for its content, display the group's name and address (or web address), and state that the ad is "not authorized by any candidate or candidate's committee." 2 U.S.C. § 441d(d)(2), (a)(3); *see also Citizens United*, 558 U.S. at 366. This modest requirement easily cleared the intermediate-scrutiny

hurdle. The Court held that the disclaimer was adequately tailored to serve the purpose of "provid[ing] the electorate with information" and also "avoid confusion by making clear that the ads are not funded by a candidate or political party." *Citizens United*, 558 U.S. at 368 (upholding the disclaimer rule as applied to the ads); *see also id*. at 371 (summarily upholding the disclaimer rule as applied to the movie).

The Court's evaluation of the disclosure provision entailed little additional discussion. BCRA requires that "any person who spends more than $10,000 on electioneering communications within a calendar year" must file a disclosure statement with the FEC identifying "the person making the expenditure, the amount of the expenditure, the election to which the communication was directed, and the names of certain contributors [donors who contributed $1,000 or more to the expenditure]." *Id.* at 366 (citing 2 U.S.C. § 434(f)(1)–(2)). This one-time, event-driven disclosure rule is far less burdensome than the comprehensive registration and reporting system imposed on political committees; the Court upheld it without much comment. *Id.* at 368–69 (upholding the disclosure rule with respect to the ads); *see also id*. at 371 (summarily upholding the disclosure rule with respect to the movie). The Court did, however, affirmatively reject the argument that the disclosure rule for electioneering communications should be limited to speech that is the functional equivalent of express advocacy. *Id.* at 369 ("[W]e reject Citizens United's contention that the disclosure requirements must be limited to speech that is the functional equivalent of express advocacy."). It's not clear why the Court addressed this argument; it had earlier concluded that *Hillary* and the ads promoting it were the

equivalent of express advocacy, so this argument no longer mattered. *Id.* at 324–25.

Finally, the Court reaffirmed that the disclosure requirement might be unconstitutional as applied to particular groups "if there were a reasonable probability that the group's members would face threats, harassment, or reprisals if their names were disclosed." *Id.* at 370 (citing *McConnell*, 540 U.S. at 198). Citizens United had no such evidence, so there was no impediment to applying the disclosure rule to it. *Id.*

## G. Wisconsin Regulators React

*Citizens United* has obvious and significant implications for Chapter 11, so it comes as a bit of a surprise that the Wisconsin legislature has not amended the statute to account for the changes wrought by the decision. The GAB has not been similarly silent.

In response to *Citizens United*, the Board immediately announced that it would not enforce section 11.38(1)(a)1, the statutory ban on corporate political expenditures.[12] The agency then promulgated an emergency rule suspending the statutory ban and creating a new category of political speakers—"independent disbursement organizations"—that would thenceforward be subject to the organizational, registration, and reporting requirements of Chapter 11. The emergency rule,

---

[12] *See* GAB, Open Session Minutes (Mar. 23–24, 2010), http://gab.wi.gov/sites/default/files/event/74/03_23_24_10_open_session_minutes_final_pdf_20361.pdf.

GAB § 1.91, is completely new; it was approved on May 10, 2010, and became effective ten days later.[13] It remained in effect for 150 days and was eligible for several extensions while the agency held public hearings on a permanent rule. *See generally* WIS. STAT. § 227.24. The extensions were approved, and the final rule became effective on July 1, 2012, while this litigation was underway. 678 Wis. Admin. Reg. 43 (June 30, 2012).

Briefly, the new rule suspends section 11.38(1)(a)1, the statutory ban on political spending by corporations, "until such time as a court having jurisdiction in the State of Wisconsin rules that a corporation … may constitutionally be restricted from making an independent disbursement." WIS. ADMIN. CODE GAB § 1.91(2). The rule also requires every "organization" that independently raises and spends money for political speech to comply with the registration and reporting requirements applicable to political committees. *See id.* § 1.91(3)–(8). More specifically, the rule applies most PAC duties to organizations that "accept[] contributions for, incur obligations for, or mak[e] an independent disbursement exceeding \$25 in aggregate during a calendar year." *Id.* § 1.91(3); *see id.* § 1.91(4)–(8). "Organization" is not a statutory term; the rule defines it broadly to include any person (including any association, partnership, or corporation), but not individuals and committees already required to register and report under Chapter 11. *Id.* § 1.91(1)(g)–(h). Though lengthy, GAB § 1.91 is central to the claims in this case; we reproduce it in full in the appendix.

---

[13] *See* GAB, Open Session Minutes (May 10, 2010), http://gab.wi.gov/sites/default/files/event/74/05_10_10_open_session_minutes_final_pdf_16560.pdf; 653 Wis. Admin. Reg. 16 (May 31, 2010).

Finally, the Board kept its new version of GAB § 1.28 on track, sweeping all issue advocacy that refers to a candidate in the lead-up to an election into the state PAC system. The new rule was published in final form on July 31, 2010, and became effective the next day. 655 Wis. Admin. Reg. 41 (July 31, 2010). In brief, the new version of GAB § 1.28 removes the express-advocacy limitation from the old rule, introduces broad new definitions of "communication" and "political purpose," and creates a conclusive presumption that almost anything said about a candidate at election time triggers all the restrictions and requirements of Chapter 11. This rule is also central to the claims in this case; we reproduce it here. To better illustrate the expansive scope of the new rule, deletions from the old rule are marked with strikeouts and new language is underlined:

> **GAB 1.28 Scope of regulated activity; election of candidates.**
>
> **(1)** Definitions. As used in this rule:
>
> (a) "Political committee" means every committee which is formed primarily to influence elections or which is under the control of a candidate.
>
> (b) "Communication" means any printed advertisement, billboard, handbill, sample ballot, television or radio advertisement, telephone call, e-mail, internet posting, and any other form of communication that may be utilized for a political purpose.

<u>(c)</u> "Contributions for political purposes" means contributions made to 1) a candidate, or 2) a political committee or 3) an individual who makes contributions to a candidate or political committee or incurs obligations or makes disbursements for ~~the purpose of expressly advocating the election or defeat of an identified candidate~~ <u>political purposes</u>.

**(2)** Individuals other than candidates and ~~committees~~ <u>persons</u> other than political committees are subject to the applicable ~~disclosure-related and recordkeeping-related~~ requirements of ch. 11, Stats., ~~only~~ when they:

(a) Make contributions <u>or disbursements</u> for political purposes, or

(b) Make contributions to any person at the request or with the authorization of a candidate or political committee, or

(c) Make a communication ~~containing~~ <u>for a political purpose.</u>

**(3)** <u>A communication is for a "political purpose" if *either of* the following applies:</u>

(a) <u>The communication contains</u> terms such as the following or their functional equivalents with reference to a clearly identified candidate ~~that expressly advocates the election or defeat of that candidate~~ and ~~that~~ unambiguously relates to the campaign of the candidate:

1. "Vote for;"
2. "Elect;"
3. "Support;"
4. "Cast your ballot for;"
5. "Smith for Assembly;"
6. "Vote against;"
7. "Defeat;" <u>or</u>
8. "Reject."

(b) The communication is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate. A communication is susceptible of no other reasonable interpretation if it is made during the period beginning on the 60th day preceding a general, special, or spring election ending on the date of that election or during the period beginning on the 30th day preceding a primary election and ending on the date of that election and that includes a reference to or depiction of a clearly identified candidate and:

1. Refers to the personal qualities, character, or fitness of that candidate;

2. Supports or condemns that candidate's position or stance on issues; or

3. Supports or condemns that candidate's public record.

W<small>IS</small>. A<small>DMIN</small>. C<small>ODE</small> GAB § 1.28 (emphasis added).[14]

## H. Much Litigation Ensues

The two new rules were controversial and obvious candidates for constitutional challenge. Within a fortnight three lawsuits were filed seeking injunctive relief against one or both of the rules. The first was *Wisconsin Club for Growth, Inc. v. Myse*, a federal action filed in the Western District of Wisconsin. The plaintiffs there challenged GAB § 1.28 on two grounds: (1) the agency lacked the statutory authority to expand the scope of the statutory scheme; and (2) the new rule is overbroad and impermissibly burdens free-speech rights in violation of the First Amendment. *See* Complaint at 13–17, *Wis. Club for Growth, Inc. v. Myse*, No. 10-cv-427-wmc (W.D. Wis. filed July 31, 2010).

Wisconsin Right to Life filed this suit in the Eastern District a few days later. The third suit was an original action initiated in the state supreme court. *See Wis. Prosperity Network v. Myse*, 810 N.W.2d 356 (Wis. 2012). Filed on August 9, 2010, the original action raised essentially the same claims as the *Wisconsin Club for Growth* litigation. The state high court immediately issued an order enjoining enforcement of GAB § 1.28 pending further review. *Id.* at 356–57.

That move affected the two federal cases; all three lawsuits challenged GAB § 1.28. This case challenges many other laws as well, but the district judge abstained to await the outcome

---

[14] Subsection (4), not relevant here, has been omitted.

of the original action in the state supreme court, putting all the claims on indefinite hold. *Barland I*, 664 F.3d at 143.

Meanwhile, over in the Western District, the Board swiftly threw in the towel. Less than two weeks after *Wisconsin Club for Growth* was filed, the parties stipulated to the entry of final judgment, agreeing that the court "may enter a permanent injunction, order, and judgment enjoining the application or enforcement of the second sentence of Wis. Admin. GAB § 1.28(3)(b)." Stipulation, *Wis. Club for Growth*, No. 10-cv-427-wmc, ECF No. 22-1. (To remind the reader: The second sentence of § 1.28(3)(b) is a conclusive presumption that almost anything said about a candidate in any medium of public expression within 30 days of a primary or 60 days of a general election counts as a communication made for a "political purpose," triggering political-committee status and the other restrictions and requirements of Chapter 11.) The stipulation expressly resolved the first claim in the case, which had challenged § 1.28 as ultra vires. If the court accepted the stipulation, the plaintiffs agreed to dismiss their First Amendment claim without prejudice.

The court did not accept the stipulation. The judge in the Western District opted to abstain in favor of the state supreme court, as his colleague in the Eastern District had done. *See Wis. Club for Growth, Inc. v. Myse*, No. 10-cv-427-wmc, 2010 WL 4024932, at *6–7 (W.D. Wis. Oct. 13, 2010). With both federal actions stayed and the state supreme court's place-holding injunction casting significant doubt on the new rule, the Board went back to the drawing board and promulgated an

emergency rule eliminating the questionable second sentence
of GAB § 1.28(3)(b).[15]

*   *   *

The following year was an extraordinary one in Wisconsin
political history, as we explained in *Barland I* and need not
repeat here. 664 F.3d at 144–45. In anticipation of unprece-
dented legislative recall elections, the Wisconsin Right to Life
State PAC returned to the district court and sought relief from
the stay for the limited purpose of litigating its challenge to
section 11.26(4), the aggregate limit on annual contributions to
candidates, parties, and political committees. *Id.* at 145. The
district judge declined to lift the stay, but we vacated and
remanded. *Id.* at 154–55. *Citizens United* had categorically
removed the anticorruption rationale as a justification for
campaign-finance restrictions on independent political groups.
This left "*no* valid governmental interest sufficient to justify
imposing limits on fundraising by independent-expenditure
organizations." *Id.* at 154. We found the aggregate contribution
limit unconstitutional as applied to independent-expenditure
groups and their donors and instructed the district court to
enter a permanent injunction enjoining its enforcement. *Id.* at
155.

The rest of the case remained stayed pending resolution of
the original action in the state supreme court, but that court

---

[15] *See* Memorandum from Kevin J. Kennedy, Director and General Counsel,
GAB, to Members, Wisconsin GAB (Dec. 22, 2010), http://gab.wi.gov/sites/
default/files/event/74/board_memorandum_emr_gab_1_28_pdf_43198.pdf;
661 Wis. Admin. Reg. 8 (Jan. 14, 2011).

could not reach a decision. With one justice recused, the court split 3–3, and on March 19, 2012, issued a per curiam order vacating the injunction and dismissing the original action. *See Wis. Prosperity Network*, 810 N.W.2d at 357. Several months earlier, however, the GAB had approved a permanent rule removing the problematic second sentence of § 1.28(3)(b).[16] But the new rule remains mired in the administrative process and is not yet on the books. The emergency rule has now expired,[17] so the 2010 version of GAB § 1.28 continues in effect.

*    *    *

Neither party saw fit to bring the regulatory and litigation history of GAB § 1.28 to our attention until we asked about it in a supplemental briefing order. This was chiefly the responsibility of the Board's counsel, an experienced lawyer in the state Department of Justice. In his supplemental brief, he explained that it would "[not] have been helpful … to go into this history" because "the history has become moot." That's an astonishing statement. History does not "become moot." And the Board's retreat from the 2010 rule—the rapid stipulation in *Wisconsin Club for Growth*, the emergency rule, and the revised permanent rule—strongly suggest a concession that § 1.28 is ultra vires, and perhaps also that it is unconstitutional. Forced

---

[16] *See* GAB, Open Session Minutes (Dec. 13, 2011), http://gab.wi.gov/sites/default/files/event/74/12_13_11_open_session_minutes_signed_pdf_62545.pdf; 669 Wis. Admin. Reg. 13 (Sept. 14, 2011) (Statement of Scope).

[17] The emergency rule expired on October 3, 2011. 668 Wis. Admin. Reg. 5 (Aug. 14, 2011) (extending the rule through October 3; no further extension granted).

to come forward with this information, counsel now represents that the Board "intends to continue to honor the stipulation" in *Wisconsin Club for Growth*, whatever that means.

This background should have been raised in the Board's initial brief. Now that we have it, we're not sure what to make of counsel's belated representation that the Board "intends to continue to honor the stipulation." The Board has not acted on this intent, at least as far as we're told, and counsel's statement is in any event vague. The stipulation was never reduced to judgment. Order, *Wis. Club for Growth*, No. 10-cv-427-wmc, ECF No. 46 (filed on Feb. 28, 2013) (dismissing case). Political speakers in Wisconsin can't rely on the agency's unofficial expression of intent to refrain from enforcing its rules. The 2010 version of GAB § 1.28 remains in force and encumbers the free-speech rights of anyone who says almost anything about a candidate near an election. We must judge the Board's actions, not its inchoate intent.

\*   \*   \*

After the state supreme court deadlocked, Wisconsin Right to Life roused this case from its slumber, filed an amended complaint, and moved for a preliminary injunction on the rest of its claims, which challenge the following statutes and rules:

- Section 11.38(1), the ban on political spending by corporations;

- Section 11.38(1)(a)3, the cap on the amount a corporation may spend to raise money for an affiliated political committee;

- Sections 11.01(4) (defining "committee" and "political committee"), 11.01(6) (defining "contribution"), 11.01(7) (defining "disbursement"), and 11.01(16) (defining "political purposes"), to the extent that these definitions trigger (either independently or with the administrative rules) PAC status and other restrictions and requirements for independent groups not under the control of a candidate or candidate's committee and not engaged in express election advocacy as their major purpose;

- The two new administrative rules—GAB §§ 1.28 and 1.91—promulgated in the wake of *Citizens United* to expand the scope of the regulatory scheme and impose PAC status or PAC-like duties and restrictions on newly liberated independent political speakers;

- Sections 11.12(5)–(6), the 24-hour-reporting requirement for certain late contributions and expenditures (recently amended to enlarge the reporting time to 48 hours);

- Section 11.06(7), which requires any independent group that wants to spend money to support or oppose a candidate for state or local office to file an oath affirming that the spending is not coordinated with the candidate or the candidate's agent (a related administrative rule, GAB § 1.42(1), is also challenged); and

- GAB § 1.42(5), which requires that independent political communications include a lengthy disclaimer.

In an oral ruling, the district judge granted the motion in part. The judge agreed that the plaintiffs had "some likelihood of success" on their claim that section 11.38(1)(a)1, the ban on

corporate political speech, was unconstitutional "as applied … and facially." He also agreed that the lengthy disclaimer for independent political messages—GAB § 1.42(5)—was "unduly burdensome" as applied to "ads less than 30 seconds in length" and enjoined it to that extent. The judge held that the challenge to GAB § 1.91 was moot and otherwise denied preliminary injunctive relief.

In a written order memorializing this ruling, the court entered a preliminary injunction "as to count nine … with respect to the corporate disbursement ban" and also "as to count five … with respect to ads that are less than 30 seconds in length." In all other respects, the court denied the motion for a preliminary injunction. Wisconsin Right to Life appealed.[18] *See* 28 U.S.C. § 1292(a)(1) (authorizing an interlocutory appeal from an order granting or denying an injunction).

---

[18] Actually, Wisconsin Right to Life filed three notices of appeal. The first (No. 12-2915) is an appeal from a claimed "constructive denial" of the motion for a preliminary injunction; that appeal was premature and is dismissed. The second (No. 12-3046) is an appeal from the district court's order granting in part and denying in part the plaintiffs' motion for a preliminary injunction; that appeal is proper under 28 U.S.C. § 1292(a)(1). The third (No. 12-3158) is an appeal from the district court's order denying an injunction pending appeal, but the plaintiffs did not seek an injunction pending appeal in this court; that appeal is dismissed.

## II. Analysis

### A. Rule 65(d)(1)

Although the parties have not raised it, we note a flaw in the form of the district court's injunction order. Rule 65 requires that every injunction order must "state the reasons why it issued," "state its terms specifically," and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." FED. R. CIV. P. 65(d)(1). The court's written order summarily enters a preliminary injunction "with respect to" certain parts of count five and count nine, which are only very generally described. That's not a proper injunction order. A reader would have to consult the pleadings and a transcript of the hearing to learn the scope of the injunction. On remand the district court will have to enter a new injunction to conform to this opinion and should take care to comply with the specificity requirements of Rule 65(d)(1).

### B. Injunction Standards

To obtain a preliminary injunction, the moving party must show that it has "(1) no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits." *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011). If this showing is made, "the court weighs the competing harms to the parties if an injunction is granted or denied and also considers the public interest." *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013). The "equitable balancing proceeds on a sliding-scale analysis; the

greater the likelihood of success on the merits, the less heavily the balance of harms must tip in the moving party's favor." *Id.*

In First Amendment cases, however, the likelihood of success on the merits is usually the decisive factor. "[T]he loss of First Amendment freedoms … unquestionably constitutes irreparable injury," and "injunctions protecting First Amendment freedoms are always in the public interest." *ACLU v. Alvarez*, 679 F.3d 583, 589, 590 (7th Cir. 2012) (internal quotation marks omitted). On the merits questions, "the burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). Here, the Board bears the burden of justifying the regulatory scheme: "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *McCutcheon*, 134 S. Ct. at 1452 (internal quotation marks omitted).

This case is only nominally in a "preliminary" stage. The claims have been tested through several rounds of briefing both in the district court and on appeal. Multiple statutes and rules are challenged, both facially and "as applied," but few of the claims depend on specific application facts. *See Ezell*, 651 F.3d at 697 ("In a facial constitutional challenge, individual application facts do not matter."). There are no factual disputes for trial. We are confronted with purely legal questions, which we review de novo. *See Korte*, 735 F.3d at 665. As in *Barland I*, our resolution of the disputed legal issues has the effect of requiring the entry of a permanent injunction enjoining the enforcement of the unconstitutional provisions. 664 F.3d at 155. Indeed, the Board concedes that some of the challenged

statutes and rules are unconstitutional or require a limiting construction, so we start there.

## C. Concessions of Unconstitutionality

### 1. *Section 11.38(1)(a)1, the Ban on Corporate Political Expenditures*

The Board concedes, as it must, that Wisconsin's ban on corporate political expenditures, section 11.38(1)(a)1, is facially unconstitutional. The state law is indistinguishable from the federal statute at issue in *Citizens United* and must suffer the same fate. *See Am. Tradition P'ship v. Bullock*, 132 S. Ct. 2490, 2491 (2012) (per curiam) (applying *Citizens United* to invalidate a similar Montana statute). As we have noted, soon after *Citizens United* was decided, the Board promulgated a rule effectively acknowledging the statute's unconstitutionality, although authorizing its enforcement if a court were to declare it constitutional. *See* GAB § 1.91(2).

There "can be no serious doubt" that "the holding of *Citizens United* applies to the [Wisconsin] state law." *Am. Tradition P'ship*, 132 S. Ct. at 2491. The district court preliminarily enjoined the enforcement of the statute. On remand the injunction against section 11.38(1)(a)1 should be made permanent.

**2.** *Section 11.38(1)(a)3, the Cap on Corporate Fundraising for an Affiliated PAC*

The Board also agrees that section 11.38(1)(a)3 is unconstitutional. That subsection of the statute caps the amount a corporation may spend to solicit contributions to an affiliated PAC. Originally set at $500, the cap was recently raised to $20,000 or 20% of the prior year's contributions. *See* 2013 Wis. Act 153 § 21m. The amendment does not affect the constitutional analysis. The statute is plainly unconstitutional under the rationale of *Citizens United* and our decision in *Barland I*, as the Board concedes. But the district court did not enjoin it.

The Board's counsel advises us that the Board will not enforce the statute against Wisconsin Right to Life and its state PAC, but the no-enforcement pledge is good for them only, not other independent groups in Wisconsin. This appellate concession raises a question about whether Wisconsin Right to Life continues to have standing on this claim. A preenforcement challenge requires a credible threat of prosecution, *Schirmer v. Nagode*, 621 F.3d 581, 586 (7th Cir. 2010), which ordinarily ceases to exist "when a state agency acknowledges that it will not enforce a statute because it is plainly unconstitutional," *Schober*, 366 F.3d at 492. Even if the plaintiff's standing was secure when the case was filed, a controversy can become moot if the threat of prosecution has evaporated. *Winsness v. Yocom*, 433 F.3d 727, 736 (10th Cir. 2006).

On the other hand, a case does not become moot merely because the defendants have stopped engaging in unlawful activity. "[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is

absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 190 (2000). The Board hasn't raised the voluntary-cessation doctrine, and its inconsistent and shifting positions do not give us much confidence in its representation that it will not enforce the statute. By not fully disclaiming the right to enforce this facially invalid statute, the Board's halfhearted concession leaves us with no assurance that it will continue to recognize its unconstitutionality.

To repeat what we said in *Barland I*: "[A]fter *Citizens United* there is *no* valid governmental interest sufficient to justify imposing limits on fundraising by independent-expenditure organizations." 664 F.3d at 154. The statute is unconstitutional on its face, so it cannot be enforced *against anyone*. Accordingly, on remand section 11.38(1)(a)3 should be permanently enjoined.

### 3. *GAB § 1.42(5), the Lengthy Regulatory Disclaimer*

The Board also admits that GAB § 1.42(5), the wordy regulatory disclaimer, is unconstitutional as applied to 30-second radio ads. The extra verbiage required by the rule goes well beyond the short disclaimer required by statute. But it simply repeats—in 50 extra words—the very same point: that the political message was not authorized by a candidate or a

candidate's agent or committee.[19] The Board has not identified any regulatory purpose for the extra words, which consume a significant amount of paid advertising time in a broadcast ad. We're told that for television ads the regulatory disclaimer may appear in written form and need not be spoken. Wisconsin Right to Life has challenged the rule only as applied to 30-second radio ads, and the Board has conceded that claim. In light of this concession, the Board hasn't offered any reason for the long and repetitive regulatory disclaimer, and frankly we can't see the point of requiring it in ads of *any* length. But the claim is limited to 30-second radio ads.

The district court granted a preliminary injunction on this claim, but we note an error in the court's written order, which enjoins GAB § 1.42(5) "with respect to ads that are *less than* 30 seconds in length." (Emphasis added.) Everyone understood that the claim concerned 30-second ads; while this implicitly includes ads of shorter duration, the injunction should *not* be limited to ads of "less than" 30 seconds. On remand the court

---

[19] The disclaimer required by statute is: "Not authorized by any candidate or candidate's agent or committee." WIS. STAT. § 11.30(2)(d). The disclaimer required by the rule is:

> The committee (individual) is the sole source of this communication and the committee (individual) did not act in cooperation or consultation with, and in concert with, or at the request or suggestion of any candidate or any agent or authorized committee of a candidate who is supported or opposed by this communication.

WIS. ADMIN. CODE GAB § 1.42(5).

should permanently enjoin enforcement of GAB § 1.42(5) against 30-second radio ads and ads of shorter duration.

### 4. *Section 11.01(16), the Statutory Definition of "Political Purposes," and GAB § 1.28(1), the Regulatory Definition of "Political Committee"*

The Board also agrees that the statutory definition of "political purposes," which triggers PAC duties and other requirements and restrictions, is vague and overbroad in the sense meant by *Buckley* and requires a limiting construction.[20] The Board likewise agrees that the regulatory definition of "political committee" is similarly vague and overbroad and must be narrowly construed.

Section 11.01(16) provides that "[a]n act is for 'political purposes' when it is done *for the purpose of influencing the election or nomination* for election of any individual to state or local office," or "for the *purpose of influencing the recall* from or retention in office of an individual holding a state or local office," or "*attempting to influence* an endorsement or nomination to be made at a convention of political party members."

---

[20] Again, Chapter 11 is structured so that political-committee requirements and the other prescriptions and proscriptions of the regulatory scheme are triggered indirectly, by the making of contributions and disbursements. *See* WIS. STAT. § 11.01(4) (defining "committee"); § 11.01(6) ("contribution"); § 11.01(7) ("disbursement"); § 11.05 (requiring registration); § 11.06 (reporting); §§ 11.12 and 11.16 (permitting only a registered treasurer to receive contributions or make disbursements); § 11.26 (limiting contributions).

WIS. STAT. § 11.01(16), (16)(a)2 (emphases added). GAB
§ 1.28(1)(a) provides that "'[p]olitical committee' means every
committee which is formed primarily *to influence elections* or
which is under the control of a candidate." GAB 1.28(1)(a)
(emphasis added).

The "influence an election" language in both definitions
raises the same vagueness and overbreadth concerns that were
present in federal law at the time of *Buckley.* The Court held
that this kind of broad and imprecise language risks chilling
issue advocacy, which may not be regulated; the same reason-
ing applies here. The Board acknowledges as much and
suggests a limiting construction to confine the definitions to
express advocacy and its functional equivalent. That's how the
Attorney General and the state supreme court have under-
stood the statute. *See Wis. Mfrs. & Commerce*, 597 N.W.2d at
728–31; 65 Op. Atty. Gen. 145.

As we've noted, after *Buckley* the legislature amended the
statutory definition of "political purposes" to incorporate an
express-advocacy limitation. But the broad "influencing"
language remains in the statute, and the express-advocacy
limitation carries some residual vagueness and overbreadth:
"Acts which are for 'political purposes' include *but are not
limited to* … [t]he making of a communication which expressly
advocates the election, defeat, recall or retention of a clearly
identified candidate … ." WIS. STAT. § 11.01(16)(a)1 (emphasis
added). The "not limited to" language holds the potential for
regulatory mischief. Perhaps it was included to leave room for
regulation of the "functional equivalent" of express advocacy

as that term was later explained in *Wisconsin Right to Life II*.[21] Beyond that, however, the language contains persistent vagueness and overbreadth.

As federal judges "we are 'without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent.'" *Stenberg v. Carhart*, 530 U.S. 914, 944 (2000) (quoting *Boos v. Barry*, 485 U.S. 312, 330 (1988)). The "unless" clause in this important federalism principle should be invoked sparingly and with caution. A federal court cannot "make a binding interpretation of a state statute, endeavoring to trim its vague provisions; if it attempts a narrowing interpretation that deviates widely from the statute's apparent meaning it is taking a big risk that the state will reject the interpretation." *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 500 (7th Cir. 2012) (Posner, J., concurring in part and dissenting in part). The alternative is to strike the statute and let the state legislature or the state supreme court bring it into conformity with the federal Constitution.

We're confident that the proposed narrowing construction is reasonable, readily apparent, and likely to be approved by the state courts. The state's highest court and its Attorney

---

[21] The "not limited to" language may have been included to account for the fact that the definition of "political purposes" applies comprehensively to candidates, their connected committees, parties, independent groups, and individuals. Communications by candidates and their connected committees obviously are "unambiguously related to the campaign" of a particular candidate. *Buckley v. Valeo*, 424 U.S. 1, 80 (1976). As applied to political speech by noncandidates and outside groups, however, the definition raises vagueness and overbreadth concerns.

General have acknowledged that when Chapter 11 is applied beyond candidates, their committees, and political parties, it must be narrowly construed to comply with *Buckley*'s express-advocacy limitation; the administration of the state's campaign-finance system has generally reflected this understanding for many decades. Accordingly, we accept the proposed narrowing construction. As applied to political speakers other than candidates, their committees, and political parties, the statutory definition of "political purposes" in section 11.01(16) and the regulatory definition of "political committee" in GAB § 1.28(1)(a) are limited to express advocacy and its functional equivalent as those terms were explained in *Buckley* and *Wisconsin Right to Life II.*

### D. Other Provisions

#### 1. *GAB § 1.28 and GAB § 1.91*

Wisconsin Right to Life argues that GAB §§ 1.28 and 1.91 unconstitutionally expand the reach of the regulatory scheme by imposing political-committee status and other restrictions on groups engaged in issue advocacy and "PAC-like" burdens on independent political groups not engaged in express advocacy or its equivalent as their major purpose. The argument is fuzzy, but we understand it to be twofold: (1) the rules cast too wide a net by capturing unregulable issue advocacy, either explicitly or by introducing uncertainty; and (2) the rules impermissibly impose PAC status or "PAC-like" burdens on issue-advocacy groups not engaged in express advocacy as their major purpose. The complaints overlap, and both are valid.

As we've explained, the 2010 version of GAB § 1.28 deleted the express-advocacy limitation in the old rule and added language specifically designed to bring issue advocacy within the scope of the state's PAC regulatory system. That was the explicit goal; the Board sought to do by regulation what state lawmakers had failed to do by legislation. Under GAB § 1.28, all independent political speakers—individuals and all types of organizational associations—are "subject to the applicable requirements of ch. 11, Stats, when they … [m]ake a communication for a political purpose." GAB § 1.28(2)(c). The rule defines "communication" and "political purpose" quite expansively.

"'Communication' means any printed advertisement, billboard, handbill, sample ballot, television or radio advertisement, telephone call, e-mail, internet posting, and any other form of communication that may be utilized for a political purpose." *Id.* § 1.28(1)(b). This goes well beyond the federal definition of electioneering communications, which includes only "broadcast, cable, or satellite communication," 2 U.S.C. § 434(f)(3)(A)(i), and requires disclosure only when the expenditure exceeds $10,000, *id.* § 434(f)(1).

The definition of "political purpose" is similarly comprehensive. No longer confined to express advocacy and its functional equivalent, the rule covers *any* communication made within 30 days of a primary, or 60 days of a general election, that names or depicts a "clearly identified candidate" and refers to the candidate's "personal qualities, character, or fitness" or "supports or condemns" the candidate's record or "position or stance on issues." GAB § 1.28(3)(b). Any

communication of this type is conclusively treated as an "appeal to vote," *see id.*, thus triggering political-committee status and other statutory and regulatory restrictions if the very low contribution or spending threshold is crossed.

The rule is fatally vague and overbroad in several respects. First, it sweeps a far wider universe of political speech into the "applicable requirements of chap. 11, Stats." than does Chapter 11 itself, introducing confusion for ordinary political speakers who lack the background or assistance of a campaign-finance lawyer. In this regard, it may also exceed the Board's regulatory authority. The rule goes beyond the bounds of the statute itself, which under *Buckley* and *Wisconsin Right to Life II* must be narrowly construed to apply only to independent spending for express advocacy and its functional equivalent, as the Board has acknowledged. The ultra vires objection was before the state supreme court in *Wisconsin Prosperity Network* and was also raised in *Wisconsin Club for Growth*. In the federal case, the Board conceded the claim. In the state supreme court, however, the Board took a different position, defending its authority to enlarge the scope of the statutory scheme.

On the regulatory side of things, the agency's position also has shifted. When the rule was initially challenged, the Board issued an emergency rule removing the objectionable second sentence of subsection (3)(b)—the conclusive presumption that treats all issue advocacy during the 30/60-day preelection periods as express advocacy. With the emergency rule in place, the Board began the process of making the scaled-back rule permanent. In the meantime, however, the emergency rule expired, and the revised permanent rule has not yet run the

administrative gauntlet. So the 2010 rule remains in force and the Board defends it here, despite its checkered history and serious doubt about the agency's statutory authority to regulate this broadly.

Setting aside the ultra vires question, which is not specifically raised, the second sentence of subsection (3)(b) is unconstitutionally vague and overbroad in the sense meant by *Buckley*. In the First Amendment context, the doctrines of vagueness and overbreadth overlap; both are premised on concerns about chilling constitutionally protected speech. *Kolender v. Lawson*, 461 U.S. 352, 359 n.8 (1983) (explaining that in free-speech law "vagueness and overbreadth [are] logically related and similar doctrines"). Generally speaking, "[v]agueness doctrine rests on concerns about fair notice and arbitrary enforcement." *United States v. Jones*, 689 F.3d 696, 701 (7th Cir. 2012). All laws must be clear and precise enough to give a person of ordinary intelligence fair notice about what is required of him and also to guard against the arbitrary and discriminatory exercise of enforcement discretion. *See FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012).

Regulations on speech, however, must meet a higher standard of clarity and precision. In the First Amendment context, "rigorous adherence to [these] requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.* Vague or overbroad speech regulations carry an unacceptable risk that speakers will self-censor, so the First Amendment requires more vigorous judicial scrutiny. *See Smith v. Goguen*, 415 U.S. 566, 573 (1974) (explaining that where

a law reaches protected expression, "the doctrine demands a greater degree of specificity than in other contexts").

Ordinarily when a law is facially challenged on vagueness and overbreadth grounds, the "court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected" speech. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982). Put somewhat differently, a statute will be struck down as facially overbroad if it "punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep.'" *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)).

But campaign-finance laws operate in a core free-speech zone and *directly* target protected speech. In this context, we don't need to ask whether the challenged law reaches a substantial amount of protected speech; by definition, it does, because all political speech is protected. That's precisely why *Buckley* held that the "'government may regulate in th[is] area only with narrow specificity,'" 424 U.S. at 41 n.48 (quoting *Button*, 371 U.S. at 433), and drew the constitutional line at express election advocacy. So the more focused inquiry here is whether this regulation steers clear of the line drawn in *Buckley*.

Plainly it does not. For some campaign-finance laws, however, *Citizens United* has relaxed *Buckley*'s express-advocacy boundary line. As we've explained, the Court declined to apply the express-advocacy limitation to the federal disclosure and disclaimer requirements for electioneering communications. *Citizens United*, 558 U.S. at 369. This was

dicta. The Court had already concluded that *Hillary* and the ads promoting it were the equivalent of express advocacy. Still, the Supreme Court's dicta must be respected, *see United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc), and on the strength of this part of *Citizens United*, we said in *Madigan* that the "distinction between express advocacy and issue discussion does not apply in the disclosure context," 697 F.3d at 484.

This aspect of *Citizens United* must be understood in proper context. The Court's language relaxing the express-advocacy limitation applies only to the specifics of the disclosure requirement at issue there. The Court was addressing the one-time, event-driven disclosure rule for federal electioneering communications, *see* 2 U.S.C. § 434(f), a far more modest disclosure requirement than the comprehensive, continuous reporting regime imposed on federal PACs, *see id.* § 434(a)–(b), or even the less burdensome disclosure rule for independent expenditures, *see id.* § 434(c). When the Court said that "disclosure is a less restrictive alternative to more comprehensive regulations of speech," *Citizens United*, 558 U.S. at 369, it was talking about the disclosure requirement for electioneering communications. In that specific context, the Court declined to apply the express-advocacy limiting principle. But nothing in *Citizens United* suggests that the Court was tossing out the express-advocacy limitation for *all* disclosure systems, no matter how burdensome. To the contrary, the Court spent several pages explaining that a corporation's option to form an affiliated PAC is too burdensome to justify banning the corporation itself from speaking. *Id.* at 337–39.

Lifting the express-advocacy limitation more broadly would have been a major departure from *Buckley* and is not likely to have been left implicit. *Citizens United* approved event-driven disclosure for federal electioneering communications—large broadcast ad buys close to an election. In that specific and narrow context, the Court declined to enforce *Buckley*'s express-advocacy limitation, but it went no further than that.

So it's a mistake to read *Citizens United* as giving the government a green light to impose political-committee status on every person or group that makes a communication about a political issue that also refers to a candidate. That's what GAB § 1.28(3)(b) does. During the 30/60-day preelection periods, all political speech about issues counts as express advocacy—thus triggering full political-committee status and other restrictions—if the speaker names and says pretty much anything at all about a candidate for state or local office.

This is a serious chill on debate about public issues, which does not stop during election season. Consider two neighbors who want to print and distribute flyers encouraging support for a municipal or school project in their city. If they do so within the 30/60-day preelection periods, they can't mention the positions of any local official running for reelection—say the mayor or members of the city council or the school board—for fear of being deemed a political committee and required to organize, register, and file regular financial reports. Stating their views on a policy issue and listing the positions of the candidates—pro or con—might be construed as "support" or "condemnation" within the meaning of the rule. Or say a

local nature club wants to distribute a newsletter throughout the community educating the public about the positions of local officials on budgetary support for the parks; it can't do so during the preelection period without risking being required to register and report as a PAC. A grass-roots Tea Party issue-advocacy group might be considered a regulable state PAC if during the preelection blackout period, it publishes a pamphlet complaining about high taxes or intrusive regulation and listing the voting records of state legislators on these subjects. Indeed, the antifilibuster issue ads at stake in *Wisconsin Right to Life II* would be deemed fully regulable under GAB § 1.28(3)(b) if aired during the 30/60-day preelection periods.

Other examples can be imagined, but this gives a general sense of the chilling effect of this overbroad rule. At the low $300 statutory spending threshold (until recently, a mere $25!) ordinary citizens and interest groups are forced into the state PAC system—with all its restrictions and registration and reporting requirements—if their advocacy on public issues in the lead-up to an election also mentions a candidate. Failure to organize, register, and report as a PAC, as required by the rule, carries civil and criminal penalties. *See* WIS. STAT. §§ 11.60, 11.61.

The Board offers no substantive justification for the extraordinary reach of this rule. Instead, it relies summarily on *McConnell*, which rejected a vagueness and overbreadth challenge to similar "support" or "oppose" language in BCRA specifying when a communication by a state or local party committee counts as "[f]ederal election activity" and becomes subject to BCRA's source and amount limitations on contribu-

tions to political parties. *See McConnell*, 540 U.S. at 170 n.64; *see also Madigan*, 697 F.3d at 486. In this part of *McConnell*, the Court held that the phrases "promotes or supports a candidate for [federal] office" and "attacks or opposes a candidate for [federal] office" are clear enough for a state party committee to know when it has crossed into federal regulatory territory.

The context here is very different. The First Amendment vagueness and overbreadth calculus must be calibrated to the kind and degree of the burdens imposed on those who must comply with the regulatory scheme. The greater the burden on the regulated class, the more acute the need for clarity and precision. Political-party committees can afford campaign-finance lawyers to advise them about compliance with the rules and restrictions on hard and soft money, which was the relevant context of this part of *McConnell*. In significant contrast, under GAB § 1.28, ordinary citizens, grass-roots issue-advocacy groups, and § 501(c)(4) social-welfare organizations are exposed to civil and criminal penalties for failing to register and report as a PAC if they spend more than $300 to communicate their views about any political issue close to an election and include the name or likeness of a candidate in a way that could be construed by state regulators as a reference to the candidate's qualifications or as "support" or "condemnation" of the candidate's record or positions. Nothing in *McConnell* authorizes this.

The Board also relies on a passage in *Madigan* approving language in the Illinois campaign-finance code that keys that state's regulation of ballot-initiative activity to the making of contributions or expenditures for the purpose of "advocating

the defeat or passage of" an initiative. 697 F.3d at 485. This is the language of express advocacy and does not implicate *Buckley* vagueness and overbreadth concerns. This part of *Madigan* does not help the Board here.

Accordingly, the second sentence of GAB § 1.28(3)(b) is unconstitutional and must be enjoined. What's left of subsection (3)(b) basically tracks the boundaries for express advocacy and its functional equivalent established in *Buckley*, *McConnell*, and *Wisconsin Right to Life II*. For the most part (we'll discuss the qualifier in a moment), the remaining text of subsection (3)(b) survives review under current doctrine. The text essentially clarifies that a communication is made for a "political purpose" only if it contains either *Buckley*'s "magic words" or their "functional equivalents with reference to a clearly identified candidate and unambiguously relates to the campaign of that candidate" or, alternatively, is "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." GAB § 1.28(3)(a)–(b). As long as this definition is applied in a manner consistent with the lead opinion in *Wisconsin Right to Life II*, it withstands scrutiny, at least as the Supreme Court's caselaw stands right now. Injunctive relief against this part of the rule was properly denied.

This brings us to GAB § 1.91, which raises a related but slightly different concern. The Board adopted this rule in the immediate aftermath of *Citizens United* to bring all independent groups—including newly liberated independent advocacy groups that operate in the corporate form—under the umbrella of the regulatory scheme. Wisconsin Right to Life argues that

§ 1.91 is unconstitutional to the extent that it imposes PAC-like burdens on independent groups not under the control of a candidate or candidate's committee and not engaged in express advocacy as their major purpose.[22] Once again, this argument draws on a limiting principle announced in *Buckley*.

To avoid overbreadth concerns in this sensitive area, *Buckley* held that independent groups not engaged in express election advocacy as their major purpose cannot be subjected to the complex and extensive regulatory requirements that accompany the PAC designation. 424 U.S. at 79 ("To fulfill the purposes of the [FECA,] [political-committee requirements] need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate."). The Court has repeatedly

---

[22] The district court did not address § 1.91 on the merits, concluding instead that the challenge was moot because the emergency rule expired while the case was on hold awaiting a decision from the state supreme court. The emergency rule was replaced by a permanent rule that is identical in all material respects. Still, regarding this claim, the Board has staked its appellate fortunes entirely on mootness.

The Board explains that the permanent rule was renumbered to correct an alphabetizing error and insists that this technical change required Wisconsin Right to Life to amend its complaint if it wanted to keep this claim alive. Not so. The expiration of a temporary rule "will not moot an attack … if there is a reasonably concrete basis to anticipate that the expired rule will be reenacted in a form that will raise the same questions." 13C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3533.6 (3d ed. 2008). What was subsection (f) in the emergency rule is now subsection (g) in the permanent rule, but in all material respects, the permanent and emergency rules are identical. This claim is not moot.

reaffirmed this principle. *See Wis. Right to Life II*, 551 U.S. at 477 n.9 ("PACs impose well-documented and onerous burdens, particularly on small nonprofits."); *FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 254–56 (1986) (noting that PAC burdens "may create a disincentive" to engage in political speech because the applicable duties and restrictions "require a far more complex and formalized organization than many small groups could manage").

But it's also clear that outside groups—even those whose major purpose is not express advocacy—are not completely immune from disclosure and disclaimer rules for their occasional spending on express election advocacy. *Citizens United*, 558 U.S. at 366–69. Even so, the Court has never endorsed imposing full, formal PAC-like burdens on these speakers.

*Madigan* explained that the "'major purpose' limitation, like the express-advocacy/issue-discussion distinction, was a creature of statutory interpretation, not constitutional command." 697 F.3d at 487. The Board takes this statement to mean that the so-called "major purpose test" in campaign-finance law no longer exists. That's incorrect. The major-purpose limitation announced in *Buckley* has not receded from the scene. It continues in force and effect as an important check against regulatory overreach and becomes more significant as the scope and burdens of the regulatory system increase.

*Madigan* declined to apply the major-purpose limitation to the Illinois disclosure system because state law defined "political committee more narrowly than FECA by covering only groups that accept contributions or make expenditures 'on behalf of or in opposition to' a candidate or ballot

initiative." *Id.* at 488. "This definition," we said, "is more targeted to campaign-related speech than FECA's definition of contribution and expenditure, which applies to anything of value given or received 'for the purpose of … influencing' an election." *Id.* (citing 2 U.S.C. § 431(8)–(9)).[23]

In contrast, Wisconsin law suffers from the same kind of overbreadth as the federal statute at the time of *Buckley*, so the major-purpose limitation has the same significance here as it did there. Under GAB § 1.91, any organization that makes "independent disbursements" is required to comply with almost all of the statutory obligations imposed on political committees. It must: (1) organize and register like a political committee (this requires, among other things, a segregated depository account and a treasurer who is subject to personal liability for regulatory violations); (2) pay the annual fee as required by section 11.055; (3) file the oath for independent disbursements under section 11.06(7) and update it as necessary; (4) comply with the attribution requirements of section 11.30(1) and (2); and (5) file detailed, year-round financial reports as required by Chapter 11 and include "all contributions received for independent disbursements, … and independent disbursements made." GAB § 1.91(3)–(8). Again, a

---

[23] Other circuits have taken varying approaches to *Buckley*'s major-purpose principle when reviewing state campaign-finance systems. *See Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 872–76 (8th Cir. 2012); *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 58–59 (1st Cir. 2011); *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1009–12 (9th Cir. 2010); *N.M. Youth Organized v. Herrera*, 611 F.3d 669, 677–79 (10th Cir. 2010); *N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 287–90 (4th Cir. 2008).

mere $300 in contributions or disbursements triggers all these PAC requirements.[24]

In essence, GAB § 1.91 establishes by rule a special PAC-like disclosure program for "independent disbursement organizations," a nonstatutory category of political speakers.[25] Disclosure rules are reviewed under intermediate scrutiny, *see Citizens United*, 558 U.S. at 366–67, which though less rigorous than strict scrutiny nonetheless requires close judicial review, *see McCutcheon*, 134 S. Ct. at 1445–46 ("[R]egardless whether we apply strict scrutiny or *Buckley*'s 'closely drawn' test, we must assess the fit between the stated governmental objective and the means selected to achieve that objective.").

"'[C]ompelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment.'" *Davis v. FEC*, 554 U.S. 724, 744 (2008) (quoting *Buckley*, 424 U.S. at 64). Campaign-finance disclosure systems implicate two basic concerns. First, forced disclosure of donors burdens associational privacy interests. *See Buckley*, 424 U.S. at 66 ("[T]he invasion of privacy of belief may be as great when the information sought concerns the giving and spending of

---

[24] The rule does not apply the statutory contribution limits or source bans to independent-expenditure organizations. The Board acknowledges that after *Citizens United* and *Barland I*, restrictions of this nature are unconstitutional as applied to independent political speakers.

[25] GAB 1284, Independent Disbursements of Corporations and Non-Political Organizations Guideline (May 2012), http://gab.wi.gov/sites/default/files/guideline/26/1284_independent_disbursement_organizations_pdf_13708.pdf.

money as when it concerns the joining of organizations, for 'financial transactions can reveal much about a person's activities, associations, and beliefs.'" (quoting *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 78–79 (1974) (Powell, J., concurring))). Second, PAC-like registration and reporting requirements impose heavy administrative burdens, creating disincentives to participation in election-related speech. *See Citizens United*, 558 U.S. at 337–38; *Mass. Citizens for Life*, 479 U.S. at 254–55. Forced to disclose donors and faced with the complex and formalized requirements of a PAC-like registration and reporting system, some groups might conclude that their "contemplated political activity [is] simply not worth it" and opt not to speak at all. *Mass. Citizens for Life*, 479 U.S. at 255.

So the Board must justify this rule under "exacting scrutiny," which requires a "substantial" relationship between the disclosure requirements and an important governmental interest. *See Citizens United*, 558 U.S. at 366–67. This is not a loose form of judicial review:

> In the First Amendment context, fit matters. Even when the Court is not applying strict scrutiny, we still require "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served,' … that employs not necessarily the least restrictive means but … a means narrowly tailored to achieve the desired objective." *Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S.

> 469, 480 (1989) (quoting *In re R.M.J.*, 455 U.S. 191,
> 203 (1982)).

*McCutcheon*, 134 S. Ct. at 1456–57. In other words, we look for "a 'relevant correlation' or 'substantial relation'" between the stated governmental objective and the means selected to achieve it. *Davis*, 554 U.S. at 744 (quoting *Buckley*, 424 U.S. at 64). Moreover, "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id.* "[I]f a law that restricts political speech does not 'avoid unnecessary abridgement' of First Amendment rights, … it cannot survive [this] 'rigorous' review." *McCutcheon*, 134 S. Ct. at 1446 (quoting *Buckley*, 424 U.S. at 25).

It's well accepted that disclosure requirements in the campaign-finance context serve important governmental interests by providing the public with information about "who is speaking about a candidate shortly before an election" and the sources of funding for campaign-related ads. *Citizens United*, 558 U.S. at 369. Here, however, we "find a substantial mismatch" between that informational objective and the means the Board has chosen to achieve it. *McCutcheon*, 134 S. Ct. at 1446. Under GAB § 1.91, *every* independent group that crosses the very low $300 threshold in express-advocacy spending must formally organize, register, and report like a political committee.

Why impose full-blown PAC duties so indiscriminately? The Board does not explain. For groups that engage in express election advocacy as their major purpose, the PAC regulatory system—with its organizational prerequisites, registration duties, and comprehensive, continuous financial reporting—is

a relevantly correlated and reasonably tailored means of achieving the public's informational interest. But the same cannot be said for imposing the same pervasive regulatory regime on issue-advocacy groups that only occasionally engage in express advocacy.

A simpler, less burdensome disclosure rule for occasional express-advocacy spending by "nonmajor-purpose groups" would be constitutionally permissible under *Citizens United*, which approved BCRA's one-time, event-driven disclosure requirement for federal electioneering communications—again, broadcast ads in excess of $10,000 aired close to an election. 558 U.S. at 366–69. That's a far cry from imposing full PAC-like burdens on all issue-advocacy groups once a modest annual spending threshold is crossed. In effect GAB § 1.91 requires every issue-advocacy group to form a PAC before spending as little as $300.01 on express advocacy, whether at election time or any other time of year. Failure to do so brings civil and criminal penalties.

We appreciate that the Board is hamstrung by the legislature's failure to update Chapter 11 to account for the effect of *Citizens United*. Federal law establishes separate disclosure tracks for political committees, *see* 2 U.S.C. § 434(a)–(b); independent expenditures, *see id.* § 434(c); and electioneering communications, *see id.* § 434(f). Full political-committee requirements apply only to "major purpose" groups within the meaning of the *Buckley* limitation. *See* Political Committee Status, 72 Fed. Reg. 5595, 5596–97 (Feb. 7, 2007). Chapter 11, in contrast, does not distinguish among independent groups; neither does GAB § 1.91. All individuals

and groups that raise and spend money independently of candidates must register and report like a PAC once the modest threshold in contributions or expenditures is crossed. Before *Citizens United*, this feature in Wisconsin's state campaign-finance system was largely obscured because most independent organizations operate in the corporate form and as such were completely banned from speaking. If they wanted to engage in occasional express advocacy, they had to form a PAC to do it. After *Citizens United*, the absence of a major-purpose limiting principle now comes to the fore.

With the legislature silent, the Board cobbled together a regulatory response, imposing most of Chapter 11's political-committee requirements on *all* independent organizations without any scope limitation—that is, without distinguishing between groups that are organized with express election advocacy as their major purpose and those that are not. Groups in the latter category thus face the same dilemma as they did before *Citizens United*: They must form a PAC to engage in occasional express advocacy.

As applied to these groups—the "nonmajor-purpose" groups—the Board makes no effort to explain how GAB § 1.91 satisfies the close tailoring required to sustain a disclosure regime under exacting scrutiny. Instead, it summarily invokes *Citizens United* and *Madigan*, which upheld disclosure requirements imposed on independent groups. As we have explained, GAB § 1.91 imposes far greater burdens on independent speakers by simply importing the political-committee requirements of Chapter 11, which in critical respects are unchanged from *Buckley*'s day.

Wisconsin's foundational campaign-finance law is in serious need of legislative attention to account for developments in the Supreme Court's jurisprudence protecting political speech. The GAB has the authority to interpret and implement the statutory scheme, but it cannot contradict Chapter 11. *See* WIS. STAT. § 5.05(1)(f); *see also Wis. Citizens Concerned for Cranes & Doves v. Wis. Dep't of Natural Res.*, 677 N.W.2d 612, 617 (Wis. 2004); *Seider v. O'Connell*, 612 N.W.2d 659, 676 (Wis. 2000). The basic design and primary requirements of the disclosure system are matters for the state legislature.

As it stands, GAB § 1.91 is a reasonably tailored disclosure rule for independent organizations engaged in express election advocacy as their major purpose, but the same is not true for issue-advocacy groups that only occasionally engage in express advocacy. The public's informational interest is strong, but requiring all issue-advocacy groups to comply with Chapter 11's burdensome PAC requirements is not a closely tailored means of achieving it. Accordingly, GAB § 1.91 is unconstitutional as applied to independent organizations whose major purpose is not express advocacy. In other respects, the rule survives First Amendment scrutiny.

### 2. *Sections 11.12(5)–(6), Reporting of Late Contributions and Expenditures*

Wisconsin Right to Life also challenges sections 11.12(5)–(6), which impose a special reporting requirement for contributions of $500 or more and expenditures of $20 or more received or made within 15 days of an election. Until recently, these late

contributions and expenditures were subject to a 24-hour reporting rule if not already included in a preprimary or preelection report. Wisconsin Right to Life maintains that 24 hours is too short but suggested at oral argument that a 48-hour requirement would likely satisfy close tailoring. The recent legislation increased the reporting time to 48 hours. *See* 2013 Wis. Act 153 §§ 13–14.

This amendment moots the challenge to the 24-hour rule. *See MacDonald v. City of Chicago*, 243 F.3d 1021, 1025 (7th Cir. 2001). In response, Wisconsin Right to Life moved to supplement the record with a declaration from the director of its PAC attesting to the burdens of the new 48-hour reporting requirement. The Board rightly objects to the submission of new factual matter on appeal. *See Berwick Grain Co. v. Ill. Dep't of Agric.*, 116 F.3d 231, 234 (7th Cir. 1997) ("The appellate stage of the litigation process is not the place to introduce new evidentiary materials."). Wisconsin Right to Life may challenge the new 48-hour requirement on remand, but it can't do so for the first time on appeal.

### 3. *Section 11.06(7), GAB § 1.42, the Oath for Independent Expenditures*

Finally, Wisconsin Right to Life challenges section 11.06(7), which imposes an oath requirement on individuals and independent committees before they spend money to support or oppose a candidate for state or local office. These independent speakers must affirm that their spending is not coordinated with the candidate or candidate's agent. A related administrative rule, GAB § 1.42(1), repeats the statutory requirement and

states that any expenditure made or obligation incurred "in support of or opposition to a specific candidate" must be made or incurred "by or through an individual or committee" that has filed the oath required by section 11.06(7).

The challenge to the oath requirement is not well-developed. Wisconsin Right to Life argues in very general terms that (1) the requirement is too burdensome because political interests are unpredictable and change rapidly in response to events unfolding in real time during an election; and (2) the rule is especially burdensome for small committees like the Wisconsin Right to Life PAC. The Board counters that the oath is a simple, one-page form with an attachment that lists the candidates to which it applies. This strikes us as a minimally burdensome regulatory requirement, and it's reasonably tailored to the public's informational interest in knowing the sources of independent election-related spending. The district court properly declined to enjoin section 11.06(7) and GAB § 1.42(1).[26]

---

[26] Several other features of the rule raise potentially troubling questions. For example, the rule creates certain presumptions that could be traps for unwary independent groups and candidates alike if not interpreted in accordance with the limits established in *Buckley* and *Wisconsin Right to Life II*, as explained above. *See* GAB § 1.42(1) (treating expenditures not preceded by a proper oath as contributions); *id.* § 1.42(6) (presumption of coordination). These provisions are not challenged here.

### III. Conclusion

To sum up, we conclude as follows:

**Corporate-speech ban.** Section 11.38(1)(a)1, the ban on political spending by corporations, is unconstitutional under *Citizens United*.

**Cap on corporate fundraising for an affiliated PAC.** Section 11.38(1)(a)3, the cap on the amount a corporation may spend on fundraising for an affiliated political committee, is unconstitutional under *Citizens United* and *Barland I*.

**Regulatory disclaimer.** The lengthy disclaimer requirement in GAB § 1.42(5) is unconstitutional as applied to 30-second radio ads and ads of shorter duration.

**Definitions of "political purposes" and "political committee."** The statutory definition of "political purposes," section 11.01(16), and the regulatory definition of "political committee," GAB § 1.28(1)(a), are unconstitutionally vague and overbroad in the sense meant by *Buckley* and require a narrowing construction. As applied to political speakers other than candidates, their campaign committees, and political parties, the definitions are limited to express advocacy and its functional equivalent as those terms were explained in *Buckley* and *Wisconsin Right to Life II*.

**PAC Status and PAC-Like Burdens on Issue-Advocacy Groups.** The second sentence of GAB § 1.28(3)(b), which treats issue advocacy during the 30/60-day preelection period as fully regulable express advocacy if it mentions a candidate, is unconstitutional. Similarly, GAB § 1.91, which imposes PAC-like registration, reporting, and other requirements on all

organizations that make independent disbursements, is unconstitutional as applied to organizations not engaged in express advocacy as their major purpose.

The other challenged statutes and rules survive First Amendment scrutiny.

On remand the district court shall issue a permanent injunction consistent with this opinion and the specificity requirements of Rule 65(d).

VACATED AND REMANDED WITH INSTRUCTIONS.

## APPENDIX

### GAB 1.91 Organizations making independent disbursements.

**(1)** In this section:

**(a)** "Contribution" has the meaning given in s. 11.01 (6), Stats.

**(b)** "Designated depository account" means a depository account specifically established by an organization to receive contributions and from which to make independent disbursements.

**(c)** "Disbursement" has the meaning given in s. 11.01 (7), Stats.

**(d)** "Filing officer" has the meaning given in s. 11.01 (8), Stats.

**(e)** "Incurred obligation" has the meaning given in s. 11.01 (11), Stats.

**(f)** "Independent" means the absence of acting in cooperation or consultation with any candidate or authorized committee of a candidate who is supported or opposed, and is not made in concert with, or at the request or suggestion of, any candidate or any agent or authorized committee of a candidate who is supported or opposed.

**(g)** "Organization" means any person other than an individual, committee, or political group subject to registration under s. 11.23, Stats.

**(h)** "Person" includes the meaning given in s. 990.01 (26), Stats.

**(2)** A corporation, or association organized under ch. 185 or 193, Stats., is a person and qualifies as an organization that is not prohibited by s. 11.38 (1) (a) 1., Stats., from making independent disbursements until such time as a court having jurisdiction in the State of Wisconsin rules that a corporation, or association organized under ch. 185 or 193, Stats., may constitutionally be restricted from making an independent disbursement.

**(3)** Upon accepting contributions made for, incurring obligations for, or making an independent disbursement exceeding $25 in aggregate during a calendar year, an organization shall establish a designated depository account in the name of the organization. Any contributions to and all disbursements of the organization shall be deposited in and disbursed from this designated depository account. The organization shall select a treasurer for the designated depository account and no disbursement may be made or obligation incurred by or on behalf of an organization without the authorization of the treasurer or designated agents. The organization shall register with the [B]oard and comply with s. 11.09, Stats., when applicable.

**(4)** The organization shall file a registration statement with the appropriate filing officer and it shall include, where applicable:

**(a)** The name, street address, and mailing address of the organization.

**(b)** The name and mailing address of the treasurer for the designated depository account of the organization and any other custodian of books and accounts for the designated depository account.

**(c)** The name, mailing address, and position of other principal officers of the organization, including officers and members of the finance committee, if any.

**(d)** The name, street address, mailing address, and account number of the designated depository account.

**(e)** A signature of the treasurer for the designated depository account of the organization and a certification that all information contained in the registration statement is true, correct and complete.

**(5)** The designated depository account for an organization required to register with the Board shall annually pay a filing fee of $100.00 to the Board as provided in s. 11.055, Stats.

**(6)** The organization shall comply with s. 11.05 (5), Stats., and notify the appropriate filing officer within 10 days of any change in information previously submitted in a statement of registration.

**(7)** An organization making independent disbursements shall file the oath for independent disbursements required by s. 11.06 (7), Stats.

**(8)** An organization receiving contributions for independent disbursements or making independent disbursements shall file periodic reports as provided ss. 11.06, 11.12, 11.19, 11.20

and 11.21 (16), Stats., and include all contributions received for independent disbursements, incurred obligations for independent disbursements, and independent disbursements made. When applicable, an organization shall also file periodic reports as provided in s. 11.513, Stats.

> **Note:** Section 11.513, Stats., was repealed by 2011 Wisconsin Act 32, section 15. As a result, the last sentence of sub. (8) is without effect and the reports described therein are not required.

**(9)** An organization making independent disbursements shall comply with the requirements of s. 11.30 (1) and (2) (a) and (d), Stats., and include an attribution identifying the organization paying for any communication, arising out of independent disbursements on behalf of or in opposition to candidates, with the following words: "Paid for by" followed by the name of the organization and the name of the treasurer or other authorized agent of the organization followed by "Not authorized by any candidate or candidate's agent or committee."

History: CR 10-087; cr. Register June 2012 No. 678 eff. 7-1-12.

WIS. ADMIN. CODE GAB § 1.91.